45 Mass. App. Ct. 495 (1998)                                495

Reproductive Rights Network v. President of the University of Massachusetts.

REPRODUCTIVE RIGHTS NETWORK & others[1] *vs.* PRESIDENT OF
THE UNIVERSITY OF MASSACHUSETTS & others.[2]

No. 97-P-0841.

Suffolk. May 27, 1998. - September 22, 1998.

Present: BROWN, GREENBERG, & LAURENCE, JJ.

*Moot Question. Practice, Civil,* Moot case. *Constitutional Law,* Freedom of
speech and press, Freedom of religion. *Civil Rights,* Coercion. *Words,*
"Threats," "Intimidation," "Coercion."

An action seeking redress for the actions of officials of the University of Mas-
sachusetts in denying access to its facilities for use as a public forum was
not rendered moot as a result of the University's subsequent issuance of a
formal policy addressing such situations. [500-501]
In an action seeking to enjoin officials of the University of Massachusetts
from interfering with the plaintiffs' free speech rights, the judge correctly
concluded that the defendants failed to demonstrate the reasonableness of
their refusal, on alleged security grounds, to have allowed the plaintiffs the
use of University facilities as a public forum; that the refusal was based on
the content of the plaintiffs' message; and that the defendants abridged the
plaintiffs' rights under the First Amendment to the United States Constitu-
tion and under art. 16 of the Massachusetts Declaration of Rights.
[501-505]
In a claim under the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H and
11I, the plaintiffs demonstrated that the defendants' use of police power to

[1] Susan Trotz and Professor Ann Withorn. The action which resulted in the
judgment we now review began with a complaint brought by Susan Trotz,
individually and on behalf of members of Reproductive Rights Network, an
unincorporated association; Michael Galvin, individually and on behalf of
ACT/UP Boston; David LaFontaine, individually and on behalf of the Coali-
tion for Lesbian and Gay Civil Rights; Ann Withorn, Marie Kennedy, Chris
Nteta, Clark Taylor, Marilyn Frankenstein, and Terrence J. McLarney, all
members of the faculty of the University of Massachusetts at Boston.

[2] Joseph Duffey as president of the University of Massachusetts at the time
the complaint was filed. During the pendency of the appeal, William Bulger
was appointed president of the University of Massachusetts and, pursuant to
Mass. R. Civ. P. 25(d), 365 Mass. 771 (1974), was automatically substituted
as a defendant in place of Duffey; the chancellor of the University of Mas-
sachusetts at Boston; the provost of the University of Massachusetts at Boston;
and the associate chancellor of the University of Massachusetts at Boston.

deny the plaintiffs their constitutional right to engage in protected political activity constituted "threats, intimidation, or coercion" within the meaning of the statute; the matter was remanded for a determination of attorneys' fees and costs for the prevailing plaintiffs. [505-510]

CIVIL ACTION commenced in the Superior Court Department on October 15, 1990.

The case was heard by *Barbara A. Dortch-Okara*, J., and entry of final judgment was ordered by *Barbara J. Rouse*, J.

*Sarah R. Wunsch* for the plaintiffs.

*Terence P. O'Malley* for the defendants.

GREENBERG, J. A judge of the Superior Court concluded, in enjoining officials of the University of Massachusetts from interfering with the plaintiffs' free speech rights, that although the acts complained of by the plaintiffs abridged their constitutional rights under art. 16 of the Massachusetts Declaration of Rights, no violation of the Massachusetts Civil Rights Act (MCRA) occurred. See G. L. c. 12, §§ 11H and 11I. The judge also denied the plaintiffs' request for attorneys' fees under the statute. The plaintiffs appeal, and the defendants cross appeal, from the judgment permanently enjoining them from interfering with the plaintiffs' right to use University facilities for political meetings. We conclude that the grant of an injunction was appropriate, but that the judge erred as to the State civil rights claim.

The plaintiffs, concerned faculty and self-described "activists," argued at trial, and contend on appeal, that the defendants should be held liable under the MCRA because they denied the plaintiffs access to a University of Massachusetts at Boston (University) building,[3] where they had planned to hold a meeting, by locking it and posting guards outside to turn away visitors. The plaintiffs claim that these actions violated their constitutional rights through "threats, intimidation, or coercion."[4] Further, they contend that other motives offered by the

---

[3]The case concerns events at the downtown Boston campus at 250 Stuart Street.

[4]In pertinent part, G. L. c. 12, § 11H, as amended by St. 1982, c. 634, § 4, provides that, "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of

45 Mass. App. Ct. 495 (1998) 497

Reproductive Rights Network v. President of the University of Massachusetts.

University as justification for its decision to cancel use of the facility should not operate as defenses under art. 16 or the MCRA.

Drawing upon the judge's findings and uncontested portions of the record, we will provide the relevant background. Hoping to foment opposition to what the plaintiffs perceived as Bernard Cardinal Law's interference with public policy on abortion rights, AIDS education in public schools, and gay and lesbian rights, the plaintiff Susan Trotz, a graduate student, sought to secure a University classroom for two organizational meetings, one to take place on Wednesday, June 13, 1990, and the other on Friday, June 15, to plan for a demonstration on Saturday, June 16. The demonstration was to take place at a cathedral in Boston where Cardinal Law would be present. She asked her faculty advisor, Professor Ann Withorn, for assistance in scheduling the space.

As she had done in the past in similar situations, Professor Withorn authorized Trotz to call the scheduling office and reserve a meeting room in Withorn's name. While the University had available "space request" forms, in practice, faculty would reserve rooms verbally without the forms, whether or not outside groups participated. The form noted that the University could withhold permission for use of its facilities if it determined that the group seeking their use "permits conduct detrimental to the best interest of the University."

A flyer, announcing the upcoming demonstration and advertising the planning meetings to be held at the University, was posted at the University and in downtown Boston. The flyer acknowledged the sponsorship of ACT UP/Boston, the Repro-

the United States, or of rights secured by the constitution or laws of the commonwealth, . . . [that person] may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured."

General Laws c. 12, § 11, as inserted by St. 1979, c. 801, § 1, provides that, "Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be fixed by the court."

ductive Rights Network, and the Coalition for Lesbian and Gay Civil Rights, along with the endorsement of seventeen other advocacy groups. One meeting was described as providing "CD [civil disobedience] Training," to be held June 13, and the other a "Pre-Action Meeting," to be held on June 15.

On Wednesday morning, June 13, a staff meeting was attended by Chancellor Sherry Penney, Vice-Chancellor for External Relations Edward O'Malley, Provost Leverett Zompa, Associate Chancellor Donald Babcock, and other senior University administrators. After discussion, which included a report that two prominent members of the board of trustees had called then President Joseph Duffey to protest the plaintiffs' use of the reserved room, a decision was made to cancel the meetings. The trustees had questioned the propriety of the University hosting an event sponsored by the plaintiff ACT UP/Boston, an organization that they associated with a demonstration that had disrupted a religious service in New York, resulting in a counter-demonstration and over 100 arrests. O'Malley agreed with the trustees that private and public fundraising might be adversely affected should the University be perceived as sponsor of such a controversial demonstration. The executive staff decided that Provost Zompa be charged with canceling that evening's meeting.

Following a conversation with Professor Withorn, in which Withorn protested the decision and argued that the meeting was not sponsored by the University, Provost Zompa relented. As originally planned, the June 13 meeting took place that evening and was attended by about eight to ten people. None of the troubles anticipated by the University officials came to pass. The next day, however, the University's executive staff, in response to continuing staff and trustee concerns over a potential counter-demonstration and resulting "media circus," reevaluated whether the next meeting scheduled for Friday, June 15, should be canceled.

After the executive meeting on June 13, Vice-Chancellor O'Malley had asked the University's community relations director, Gail Hobin, to investigate the reservation. Hobin reported that space had been reserved in Withorn's name. Hobin then alerted campus security, who dispatched two officers to the first planning meeting. The next day, Hobin told Withorn that because the public had been invited to attend, the meeting rooms had been incorrectly reserved and that security coverage was

required. Hobin wanted someone to agree to pay the $200 charge for the special police assignment. Withorn refused, stating that she had reserved space at the University the same way for thirteen years and that the assignment of a security detail was a pretext and had been unnecessary in light of the sparse attendance at the meeting.

President Duffey decided to close the building on Friday, June 15, before the second meeting could take place. At 5 P.M. that Friday, seventeen campus police officers arrived at the building. Without any explanation, they entered the building where the meeting was to take place, escorted all occupants out, and locked the doors. Among those evicted at that time were members of organizations and businesses that regularly used the building, as well as staff and faculty that had intended to work into the evening. All were told that the building would be closed for the weekend. There was confusion for the next few hours as occupants, unexpectedly expelled from the building, were able to retrieve their belongings only after extensive negotiations with the police who had orders from the provost's office not to let anyone inside. One woman who had tried to reenter the building got into a physical "tussle" with the officers. Uniformed officers were guarding the doors when thirty to fifty persons who planned to attend the meeting were barred from entering. Trotz and Withorn were among them and objected strenuously. In the end, the plaintiffs and other participants met on the sidewalk in front of the building and held the demonstration outside of the cathedral on June 16, 1990, as scheduled. Following the University's closure, one trustee sent a note to the president and chancellor congratulating them for having "closed our doors" to "these . . . religious bigots," and hoping the groups would "find another home for their organizational meetings."

On June 25, in response to these events, President Duffey issued a statement that the building had been closed because the convening groups, by failing to submit a written request form, had not followed required University procedures and that it had been impossible to ensure the safety of the building. The judge, however, found that "Duffey closed the building based on the unsupported fear of disruption at the University and the fact that ACT UP was a controversial group, not because the proper room reservation procedure was not followed."

A subsequent publication of the University's facility use

policy, created in response to these events, is not substantially different from the prior unwritten practice. The written policy reiterates that if non-University affiliated individuals are invited to an event reservations should be made through the community services office rather than the scheduling office, and that "each (administrative) office determines the amount of special cleaning and security" charges. Like the preexisting request forms, which are still in use, the new facility use policy grants University administrators unfettered discretion to deny facility use. The forms still state that approval may be denied when it would be "in the best interest of the University." Neither the written policy nor the form indicate what criteria University officials are to use to deny facility use or to assess charges.

1. *Mootness.* The defendants argue that the issues are moot because, due to changes in circumstances, the "party who claimed to be aggrieved ceases to have a personal stake in its outcome." *Hashimi* v. *Kalil*, 388 Mass. 607, 608 (1983), quoting from *Blake* v. *Massachusetts Parole Bd.*, 369 Mass. 701, 707 (1976). They contend that the events in question have passed and that they have promulgated a written policy to deal with the issue in the future.

That the planned meetings and demonstration have taken place does not extinguish the question whether art. 16 or the MCRA were violated in that instance or could potentially be violated in the future. The likelihood that a defendant will again violate a citizen's rights serves as a basis to enjoin future unlawful conduct. See *Commonwealth* v. *Adams*, 416 Mass. 558, 563-564, 566 (1993) (enjoining future police misconduct so that the unrepentant defendants would not feel "free to continue" their "unlawful conduct" in failing "to protect a citizen from the denial of his civil rights"). Such is the case here: the defendants have not voluntarily changed their policy, let alone met the burden of showing that the wrongful interference could not reasonably be expected to recur. See *United States* v. *W.T. Grant Co.*, 345 U.S. 629, 632-633 (1953); *Committee for the First Amendment* v. *Campbell*, 962 F.2d 1517, 1524 (10th Cir. 1992). Among the factors to be considered in determining the possibility of recurrence are whether the defendants have expressed an intent to comply in the future and the issuance of a new policy that meets constitutional standards. *W.T. Grant Co.*, *supra*. See *ACT-UP* v. *Walp*, 755 F. Supp. 1281, 1291 (M.D. Pa. 1991). To the extent that the University has not satisfactorily redressed the

constitutional infirmity contained in its facilities use policy, the issue is not moot.

The wrongs to which the permanent injunction extends are those that cause interference "with [the] plaintiffs' right to use University facilities on the basis of the content or viewpoint of the plaintiffs' message." One may easily imagine a recurrence of exactly the type of meetings at issue here, e.g., students invite a controversial speaker to the University, and the invitation becomes a subject of criticism by trustees and legislators who vote on the University's budget. Other public universities have had to contend with First Amendment challenges and it is likely that University of Massachusetts officials may do so in the future. See, e.g., *Brooks* v. *Auburn Univ.*, 412 F.2d 1171 (5th Cir. 1969) (Auburn University banned speaking invitation to anti-war activist the Reverend William Coffin); *Committee for the First Amendment* v. *Campbell*, *supra* at 519 (Oklahoma State University cancelled showing of film "Last Temptation of Christ"); *Brown* v. *Board of Regents of Univ. of Nebraska*, 640 F. Supp. 674 (D. Neb. 1986) (University of Nebraska's state-operated art theater cancelled showing of film "Hail Mary"). The issues in the cited cases were ones in which both parties had a stake. Certainly in the case before us, the plaintiffs have an interest in whether the MCRA applies to their activities and care about an award of attorney's fees. On the University's side, the officials charged with implementation of its facilities use policy should have a pragmatic interest in the appeal. The existing policy, as we shall discuss more fully in part 2(a), *infra*, lacks sufficient standards to prevent content-based use restrictions and imposition of security costs based upon content. Accordingly, decisions made under that policy will be influenced by the same subjective reactions that provoked this litigation. The issues are not moot as a result of the University's attempt to formalize existing rules.

2. *The University's defenses.* In their cross appeal, the defendants advance two arguments. The first is that the decision to close the University was based on reasonable security considerations. The second is that the meetings were not protected speech because the plaintiffs allegedly conspired to commit an illegal act.

(a) *The reasonable restriction defense.* The defendants argue that they justifiably revoked access to the reserved room because the plaintiffs failed to pay security charges levied by the

University for the previous Wednesday meeting. They contend that the imposition and enforcement of security charges was consistent with reasonable "time, place, or manner" restrictions on free speech under *Clark* v. *Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984), and that the University may "impose reasonable regulations compatible with [its educational] mission upon the use of its campus and facilities." *Widmar* v. *Vincent*, 454 U.S. 263, 267 n.5 (1981). As an abstract proposition, we have no quarrel with those principles, but the judge ruled, and we agree, that the defendants failed to meet the "heavy burden" of demonstrating "the appropriateness of [their] actions" in denying use of University facilities where the denial restricted the plaintiffs' constitutional rights. *Healy* v. *James*, 408 U.S. 169, 184 (1972). The record supports the judge's findings that the University's facility use policies were vague and arbitrarily applied and that the defendants did not provide "narrow, objective and definite standards to guide the security decision maker." See *Forsyth County, Ga.* v. *Nationalist Movement*, 505 U.S. 123, 130 (1992).[5] "Through its policy of accommodating their meetings," *Widmar* v. *Vincent*, 454 U.S. at 267, the University created a forum that was generally open to student and community groups. Access to a public forum cannot easily be denied to groups who meet for the communication of ideas. See *id.* at 267-268 ("The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place"). The reasonable inference drawn by the judge was that the drastic security measure of locking the building was taken in reaction to the content of the plaintiffs' message and not for failing to pay the security charge.

The record shows that the plaintiffs need not have anticipated that a security charge would be imposed for the Wednesday

---

[5]As the defendants suggest, they did not have the guidance of *Forsyth County*, which upheld a First Amendment challenge to imposed security charges, at the time of the events at issue. *Forsyth County* is, however, nonetheless retroactive. "Decisional law is generally applied 'retroactively' to past events," and "provides the necessary incentive to those aggrieved to press for change and improvement in law, and is consistent with the institutional duty of courts to resolve disputes brought before them." *Schrottman* v. *Barnicle*, 386 Mass. 627, 631-632 (1992) (citations omitted). Moreover, *Forsyth County* was foreshadowed by prior cases criticizing overbroad or vague permit practices as "prior restraints" on speech. See, e.g., *Shuttlesworth* v. *Birmingham*, 394 U.S. 147, 150-151 (1969).

meeting of ten people. Uncontested evidence demonstrates that the plaintiffs were not informed whether agreeing to pay a $200 retroactive charge for the Wednesday meeting was a condition of future facility use, nor were they informed whether they would be required to accept prospective security charges for the Friday meeting. In support of the judge's finding that the facilities' use policy was arbitrarily applied, uncontested evidence showed that a much larger group of nonstudents invited by one of the original plaintiffs, Professor Chris Nteta, had previously been allowed to meet in the campus auditorium although Nteta similarly rejected imposed security charges. Perhaps the constitutional defects in the University's imposition and enforcement of security charges were the result of simple oversight and mismanagement, as the defendants suggest. It appears, however, that the University's failure to publish an explicitly content-neutral policy, containing objective standards to guide facility reservation and security assessment, provided the defendants then and now with unbridled discretion to deny University space to the plaintiffs on the basis of content.[6]

Even if the defendants had been justified in overestimating the security necessary for the plaintiffs' meetings, the defendants' insistence on payment as a condition of use, in the absence of a content-neutral security fee policy, created "an impermissible risk of suppression of ideas." *Forsyth County,*

---

[6]As we have noted, the policy that was published after the events in question, rather than framing the University's discretion within constitutional bounds, specifically states that approval for facility use still remains within the University's discretion. The form that was in use at the time of these events is still in use and includes language that grants the University authority to manage its space "in the best interest of the University." This language, in the absence of implementation standards, is impermissible in a public institution. See *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U.S. 546, 548, 553-554 (1975) (municipal theater's standard of accepting applications "in the best interest of the community" unconstitutionally vague); *Smith* v. *University of Tenn.,* 300 F. Supp. 777, 783 (E.D. Tenn. 1969) (University standard of approving speaker invitations "in the best interests of the University" unconstitutionally vague).

The University's attempt to standardize its reservation request procedure could, if uniformly implemented, minimize discrimination against disfavored groups by equally burdening all requestors. In addition, however, the defendants may wish to consider adopting a content-neutral facility use policy. Such a policy would provide relief for both parties. The plaintiffs would be reassured that their right to controversial speech will be upheld, and University decision makers would be guided in employing constitutional grounds for assessing future approvals and security charges for the plaintiffs' speech.

505 U.S. at 129. The defendants assert that in refusing the security charges, the plaintiffs unreasonably required the University to subsidize their activities at a time when the University could ill afford to do so. It was, however, the University's failure to promulgate reasonable security standards that prompted the plaintiffs to reject the unanticipated, "discretionary" security charges. Those security concerns were primarily based on their perceived risk of a counter-demonstration on campus. ACT UP/New York's disruption of Cardinal O'Connor in Saint Patrick's Cathedral, which had occurred only a few months prior, was presumed to be the fuel for such a confrontation. However, ACT UP/Boston's nominal affiliation with the New York group does not diminish the protected status of these plaintiffs' First Amendment rights. A group's association with a radical organization is not proof of disruptiveness. See *Healy* v. *James*, 408 U.S. at 186. Interference with constitutional rights is justified only when lawlessness is imminent. *Brandenburg* v. *Ohio*, 395 U.S. 444, 447 (1969). See *Brooks* v. *Auburn Univ.*, 412 F.2d at 1173 (same). Here, the plaintiffs did not exhibit lawlessness, but rather attempted to coordinate their plans with University and city officials to plan for a demonstration for which they had a police permit. Thus, the judge correctly held that the defendants' assessment of security charges was unconstitutionally content-based.

(b) *The conspiracy defense.* The defendants contend that they were legally justified in preventing the plaintiffs from meeting on campus to plan a demonstration that was to take place during a religious ceremony, in violation of art. 2 of the Massachusetts Declaration of Rights, which guarantees freedom of worship, and of G. L. c. 272, § 38, which prohibits wilful disturbances of religious assemblies. On this point, however, the judge found that when he made the decision to close the building, President Duffey had "no evidence that the groups were planning to conduct an illegal demonstration or conspiring to disrupt a religious ceremony in violation of G. L. c. 272, § 38." Nor do the defendants make any showing that this finding is "clearly erroneous" under Mass.R.Civ.P. 52, 365 Mass. 816 (1974). The planners did discuss, among other things, the use of a sound system and air horns at the demonstration. It is hardly inevitable that this, in and of itself, amounts to an act of lawless-

.45 Mass. App. Ct. 495 (1998)                                      505

Reproductive Rights Network v. President of the University of Massachusetts.

ness.[7] To the contrary, prior to the first meeting, the plaintiffs coordinated their demonstration plans with the Boston police and the Mayor's office.[8] Finally, the judge found that President Duffey, who made the decision to close the building, was not motivated by a concern that the plaintiffs might be planning to disrupt the Cardinal's mass but by his concern for campus security. Thus, the judge correctly held that the plaintiffs were denied their right to associate and speak freely as protected under the First Amendment and art. 16 of the Massachusetts Declaration of Rights.[9]

3. *Alleged violation of the MCRA.* "To establish a claim under the [MCRA] the plaintiffs must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.' " *Swanset Dev. Corp.* v. *Taunton,* 423 Mass. 390, 395 (1996) (citations omitted). Having addressed elements one and two, *supra,* our inquiry here is whether denying access to a University building (by locking it and posting guards outside to turn away visitors) constitutes "threats, intimidation, or coercion" under the MCRA.

The Supreme Judicial Court has accepted the following definition of the term "threats, intimidation, or coercion." A " '[t]hreat' . . . involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct. . . . [Coercion involves] 'the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.' " *Planned Parenthood League of Mass., Inc.* v. *Blake,* 417 Mass. 467, 474 (citations omitted), cert. denied, 513 U.S. 868 (1994). We also note that although "the Legislature did not intend to create 'a vast constitutional tort,' " *Bally* v. *Northeastern Univ.,* 403 Mass. 713, 718 (1989), the

---

[7]Nor is it evident that the defendants had standing to raise the issue. See *Bain* v. *Springfield,* 424 Mass. 758, 768 (1997).

[8]Rather than staving off an illegal demonstration, the denial of the reserved planning space more likely interfered with the discussion of the legal restrictions negotiated by the city and demonstration leaders.

[9]The plaintiffs do not argue that their constitutional rights under art. 16 are broader than their rights under the First Amendment. Their complaint was brought under art. 16.

MCRA, "like other civil rights statutes, is remedial [in nature and] [a]s such, it is entitled to liberal construction of its terms." *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 822 (1985). The term "threats, intimidation and coercion" may take on many forms. *United States* v. *Beaty*, 288 F.2d 653, 656 (6th Cir. 1961).[10]

In the time that has elapsed since the Legislature established a State remedy for interference or attempts to interfere with the exercise or enjoyment of rights, see note 4, *supra*, the words "threats, intimidation, or coercion" have acquired some nineteen years' worth of decisional veneer. See, e.g., *Batchelder*, *supra* at 823 (intimidation or coercion found where implied threat of arrest or removal by security guard); *Bell* v. *Mazza*, 394 Mass. 176, 179 (1985) (threats, intimidation, or coercion possible where defendant homeowners threatened to do "anything," "at any cost" to keep plaintiffs from constructing a tennis court and informed plaintiffs that the defendants had formed an association to prevent the plaintiffs from exercising their rights); *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 100 (1987) (threats, intimidation, and coercion found ·where third party's threat of disruption motivated cancellation of contract); *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. at 474 (threats, intimidation, and coercion found where defendant protestors physically blocked clients and staff from exercising their rights).

Against this decisional matrix the defendants argue that even if the plaintiffs' planned meetings were constitutionally protected by art. 16 of the Massachusetts Declaration of Rights, sealing off the building did not come within the purview of the statute. First, they argue that the University's actions, i.e., the closing of the building by seventeen police officers, did not constitute a physical threat and, therefore, does not violate the statute. They also contend that the president of the University simply made an administrative decision to close a building and that the effect of this decision was to deny the demonstration organizers space to conduct their pre-action planning. As such, they maintain that they acted without intention to chill or control the plaintiffs' rights. We disagree.

---

[10]The term "threats, intimidation, and coercion," was also used in the Federal Voting Rights Act, 42 U.S.C. § 1971(b) (1994), which precedes the MCRA. We assume that the Legislature was aware of the use and meaning of the term in the Voting Rights Act. See *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 821-822 (1985).

In *Batchelder*, the Supreme Judicial Court affirmed the plaintiff's right under art. 9 of the Massachusetts Declaration of Rights to solicit signatures and distribute leaflets at a commercial shopping mall and found that the private security guard's action in ordering the candidate to stop soliciting and distributing political handbills was "sufficient intimidation or coercion to satisfy the statute." 393 Mass. at 823. Similarly, police power was used in this case to deny the plaintiffs their constitutional right to engage in protected political activity. Here, however, seventeen uniformed officers, rather than one, prevented the plaintiffs from exercising their rights and the violation occurred at a public university, rather than a commercial mall. It can be inferred from the record that had the plaintiffs crossed the line of police officers, they would have been subject to arrest for trespass. By comparison, the intimidation exceeds that of *Batchelder* not only on these accounts, but also because the defendants used a show of force designed to deny the plaintiffs entry into a room they had specifically reserved.

The defendants cannot find comfort in *Bally* v. *Northeastern Univ.*, 403 Mass. at 719, where the court denied the plaintiffs' State civil rights claim in part because of the absence of a physical confrontation. In that case, the court relied primarily on the fact that the University indiscriminately required all intercollegiate athletes to undergo drug testing and did not direct its mandate to a particular individual or class of persons. *Ibid.* The instant case is distinguishable because the University's closure was directed specifically at the demonstration planners who intended to exercise controversial speech on campus. The fact that other organizations, faculty, and staff were also locked out was incidental and unintended.

Our construction of "threats, intimidation, or coercion" under the statute as including violations of plaintiffs' rights that may not be overtly harmful or frightening, finds support in *Bell* v. *Mazza*, 394 Mass. at 183-184. The *Bell* court validated a civil rights claim where defendant homeowners threatened to "do anything at any cost" to interfere with their neighbors' construction of a tennis court. *Id.* at 179. In that case, the "things" threatened by the defendant consisted of forming a neighborhood association, writing complaining letters, taking legal action, and, in one instance, blocking the plaintiff's passage. *Id.* at 179-180. See *United States* v. *Beaty*, 288 F.2d 653, 656 (6th

Cir. 1961) (the Federal Voting Rights Act proscribes retaliatory economic coercion that is not overtly physical and "the fact that the coercion relates to land or contracts [furnishes] no excuse or defense"); *United States* v. *Bruce,* 353 F.2d 474, 476-477 (5th Cir. 1965) (enjoining white landowners from excluding black insurance salesman, who had previously been given access to the privately owned property, from collecting insurance premiums from tenants on their property and thus interfering with the salesman's right to advocate for voter registration). Contrast *Planned Parenthood League of Mass., Inc.* v. *Blake,* 417 Mass. at 474 ("There is no doubt that the defendant's conduct involved physical confrontations accompanied by threats of harm," where the defendants trespassed and used their bodies or bicycle locks to prevent others from entering or leaving the clinic and deterred patients from obtaining abortions). In the instant case, the heavy-handed use of police power was unwarranted in the circumstances and substantially exceeds the evidence of "threats, intimidation, or coercion," found in both *Bell, supra,* and *Batchelder,* 393 Mass. at 823.

Further, we are unwilling to assume that the Legislature intended to require proof that an actor specifically intended to deprive a person of a secured right by threats, intimidation, or coercion under the statute. In rejecting the plaintiff's MCRA claim, however, the judge ruled that the defendants did not "exert[ ] pressure to *frighten* or *harm* the plaintiffs for the purpose of controlling their conduct" (emphasis added). This construction of the statute is inconsistent with *Batchelder, supra,* and *Redgrave, supra,* neither of which required proof of specific intent or of some overtly menacing behavior on the part of the defendants. In *Redgrave,* the court stated that the MCRA imposes no requirement that "an actor specifically intend[s] to deprive a person of a secured right." 399 Mass. at 99. The court in *Redgrave* determined that the statute's coercion requirement was met because "the *natural effect* of the defendant's action was *to coerce* [the plaintiffs] in the exercise of [their] rights" (emphasis added). *Id.* at 100. The court also noted that "[m]aking an exemption for civil rights deprivations resulting from third-party pressure 'would reward and encourage' the very conduct which the substantive statutes prohibit. . . . [To recognize] such an exemption would tend to eviscerate the statute and defeat the legislative policies behind the statute." *Id.* at 100 (citations omitted). See *Breault* v. *Chairman of the Bd. of*

*Fire Commrs. of Springfield,* 401 Mass. 26, 36 n.12 (1987) (noting that threats, intimidation, or coercion could be found where, as in the tort sense, the actor "desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to result from it"). Compare *Longval* v. *Commissioner of Correction,* 404 Mass. 325, 332-333 (1989) (court found no coercion under the MCRA even where defendants had shackled and handcuffed prisoner to unlawfully transfer him to another unit, where officials had no "further purpose"). Cf. *Commonwealth* v. *Gordon,* 44 Mass. App. Ct. 233, 235 (1998). While we recognize that "[n]ot every violation of law is a violation of the State Civil Rights Act," *Longval, supra* at 333, we think here the act was violated.

The defendants also argue that the decision to close the building and deny the plaintiffs access was merely administrative. An administrative action, unrelated to a scheme of harassment, "does not rise to the level of threats, intimidation, or coercion." *Murphy* v. *Duxbury,* 40 Mass. App. Ct. 513, 518 (1996). This "administrative action" limitation has been previously applied to property developers' MCRA claims against municipalities. See *Swanset Dev. Corp.* v. *Taunton,* 423 Mass. at 396 (upholding summary judgment for the defendants where the denial of a plaintiff's property development plans was a non-coercive enforcement of lawful zoning regulations); *Murphy* v. *Duxbury, supra.* A corollary exemption for "direct" agency action has also been upheld. See *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington,* 399 Mass. 771 (1987) (bad faith taking of plaintiff's property unlawful, but not coercive). These cases are distinguishable from the instant case, in which free speech rights, and not property rights or relatively amorphous substantive due process rights, are invoked. As we have observed, the defendants' violation of the plaintiffs' First Amendment and art. 16 rights also violated the statute because the defendants used a detachment of uniformed officers to assert their authority, a factual element not present in the "administrative action" cases.

Accordingly, the judge's validation of the plaintiffs' constitutional claim is affirmed, the permanent injunction is still in effect, and the order denying the plaintiffs' civil rights claim is reversed. The case is remanded for a determination of plaintiffs' reasonable attorneys' fees and costs associated with the original suit. See *Cronin* v. *Tewksbury,* 405 Mass. 74, 78 (1989). The plaintiffs are also entitled to reasonable fees and costs associ-

ated with this appeal. See *id.*

*So ordered.*