Welch, J.
Introduction
The defendants have moved for summary judgment on certain counts of the second amended complaint. The plaintiff, relying on her extensive discovery and attaching numerous exhibits, vigorously argues against the grant of any summary judgment. For the reason set forth below this motion is denied in part and allowed in part.
Background Summary
This case presents extremely troubling allegations. The plaintiff, denominated Jane Doe for purposes of privacy, was civilly committed to the defendant Westlake Academy. Westlake Academy, which is owned by defendant Health and Education Services, Inc., is a secure intensive residential treatment program for mentally ill adolescents operated by Health and Education Services, Inc. by contract with the Massachusetts Department of Mental Health. Health and Education Services, Inc. operated under a master agreement with the Massachusetts Department of Mental Health to provide “residential, clinical and psychiatric services to youths in a secure setting. Teenagers admitted to the program are committed under civil commitment laws for psychiatric treatment. All clients entering the program are screened and assigned to the program by a centralized DMH process.” See contract summary of contract between DMH and Health and Education Services, Inc. (Exhibit I to plaintiffs opposition). Health and Education Services, Inc. is a private non-profit company which provides a service that the Massachusetts Department of Mental Health previously had provided through state mental hospitals. Pursuant to its contract with Massachusetts Department of Mental Health, defendant Health and Education Services, Inc. is required to operate under the same rules and regulations applicable to the Massachusetts Department of Mental Health. Defendant Health and Education Services, Inc. admits, in answers to interrogatories, that it operated the facility at Westlake for the.Massachusetts Department of Mental Health until 1995. All of the funding of Health and Education Services, Inc. is provided by the Commonwealth of Massachusetts. Massachusetts regulations provide that the intensive residential treatment program for mentally ill adolescents, that is the treatment program to which the plaintiff was civilly committed at Westlake, provides that such programs as that at Westlake are “designated as facilities under the control of Massachusetts Department of Mental Health.” Code of Massachusetts Regulations title 104 chapter 2.14(4a). The Massachusetts regulations which apply to such intensive resi *354 dential treatment programs as Westlake Academy govern the eligibility for such programs. 104 CMR §2.14(7). The regulations also dictate the client population, the admissions criteria, the length of stay, the bed capacity, the location and staffing of each such intensive residential treatment programs.
According to the plaintiffs allegations, plaintiff Jane Doe was a ward of the State of Maine. She attended the Westlake program for approximately 21 months. She was considered “a mentally ill adolescent.” This is defined in 104 CMR 2.14 as “an adolescent (she was 17 years old at the time) whose mental illness is characterized by a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality or ability to met the ordinary demands of life, but shall not include alcoholism.” Jane Doe’s mental illness apparently resulted from years of severe sexual and physical abuse. Many of the female adolescent residents at the Westlake program have had a history of sexual abuse victimization. Plaintiff Jane Doe exhibited her mental problems by behaving in sexually provocative ways. This was well recognized by the staff and supervisors of the Westlake program. One of the reasons for plaintiff Jane Doe’s confinement to a locked facility was her inability to behave in an appropriate and safe nonsexual manner. The goal of her treatment program was for her to learn to behave in a more appropriate manner. A month prior to being transferred to less secure facility in Maine, plaintiff Doe was allowed to leave the locked facility for weekend visits home to Maine. She was allowed to leave only with an escort from the program. It was decided by supervisors at the Westlake program that staff member (and defendant) Jeffrey Senechal, alone would transport Jane Doe from Westlake in Gardner, Massachusetts to the bus station in Boston for her visits. This was done despite there being in-house regulations (due to an earlier incident of sexual misconduct between a staff member and a female client) that a male staffer alone would not transport a female client. Indeed, this arrangement was made even though supervisors had been informed by Senechal that plaintiff Jane Doe was behaving in a sexually provocative way with him. Defendant Senechal did transport the plaintiff on various occasions and failed to comply with various reporting requirements regarding his location and sign-out or sign-in policies. Jane Doe alleges that defendant Jeffrey Senechal had sexual relations with her on several occasions during these transports. Following the plaintiffs transfer to a childrens home in Maine it was discovered that plaintiff Doe was pregnant. The plaintiff maintains that Jeffrey Senechal is the childs father. Despite an order by this court (which has been unsuccessfully appealed all the way to the United States Supreme Court) Senechal still refuses to submit a DNA sample. The child was born and subsequently adopted by a third party.
As a result of her pregnancy, and her decision to give up the child, the plaintiff has suffered further psychiatric problems according to the complaint. These allegations are buttressed by various psychological reports provided in opposition to the motion for summary judgment. One such report details the plaintiffs hospitalization resulting from depression suffered by the plaintiff as a result of her pregnancy, the adoption and her realization that she had been sexually used by her former counselor defendant Senechal.
The complaint also alleges that Westlake and Health and Education Services, Inc. failed to adequately investigate Senechal’s background before hiring him, failed to adequately train or supervisor him. Again, the plaintiff presents various pieces of evidence obtained during discovery supporting these allegation.
Discussion
Certain of the counts are not supported by any evidence despite the plaintiffs extensive discovery in these matters. Thus, summary judgment on these matters is appropriate. For example Count I alleges that the sexual abuse took place on the property which was owned or controlled by Westlake Academy. That' count alleges negligent security in the maintenance and control of the premises. All parties agree that the alleged sexual abuse did not occur on the Westlake premises and that there is no evidence of negligence security “in the maintenance and control of the premises.” Therefore, summary judgment is allowed but without prejudice to the plaintiff to amend her negligent security claim should the plaintiff allege negligent security beyond the confines of the premises.
Likewise, Count XV alleges negligence against defendant Jeffrey Senechal. This negligence allegedly result when Senechal “sexually abused the plaintiff, Jane Doe resulting in her becoming pregnant.” There is no evidence that the sexual intercourse was in any way accomplished by a negligent act. Instead, the evidence established to date is that Jeffrey Senechal allegedly intended to have sexual relations with a client of the Westlake Academy. Therefore, summary judgment is appropriate as to Count XV.
Finally as to Count XX, that claim alleges negligent hiring, training and supervision on the part of defendant Robert Johnston. At oral argument on this motion the plaintiff admitted that she had no evidence that Robert Johnston was involved in the hiring of Jeffrey Senechal. The plaintiff has produced sufficient evidence establishing that there exists a genuine issue of material fact as to whether Johnston was negligent in later training and supervising Senechal. Summary judgment, however, is granted as to so much of Count XX that alleges negligent hiring.
Two particular counts, one alleging a violation of the State Civil Rights Act and the other alleging a violation of the Federal Civil Rights Act encompassed by 42 U.S.C. §1983, deserve more detailed discussion.
*355 Massachusetts Civil Rights Act
The plaintiff brings various counts alleging that the defendants violated the Massachusetts Civil Rights Act, G.L.c. 12, §11H-I. That act provides an individual their private cause of action whenever another person, whether or not acting under the cover of law, interferes “by threats, intimidation or coercion” with the exercise or enjoyment of a constitutional right secured by the United States Constitution or by the constitution or laws of the Commonwealth. The Federal or State Constitutional right at issue here is somewhat hazy. The plaintiff argues that Senechal’s sexual conduct with a mentally ill adolescent under his care and protection violated the plaintiffs “right to be free from unreasonable seizure as guaranteed Fourteenth Article of the constitution of the Commonwealth of Massachusetts” and the “right to be free, safe and happy as guaranteed by the First Article of the constitution of the Commonwealth” and the right to the “enjoyment of life and liberty guaranteed by Tenth Article of the constitution of the Commonwealth.” For the purposes of this discussion, one must assumegiven the severe psychological illness of the plaintiff indicated in various doctor’s evaluationsthat she was incapable of consenting to having sexual relations. There are also allegations that the defendant Senechal misused his position at Westlake to psychologically manipulate the plaintiff into having sex with him. Such sexual relations are unlikely to be considered a “unreasonable seizure” as set forth in the Massachusetts Constitution. And it is doubtful that one could actually enforce some constitutional right to be “happy” under the State Constitution. Nevertheless, it is not difficult to assume that there is some sort of substantive due process right under both the Federal and State Constitutions for an involuntarily committed patient of a mental hospital to be free from non-consensual sexual advances by the mental institution’s agents.
The real stumbling block to this claim comes in that the plaintiff cannot establish that her constitutional right was deprived by means of “threats, intimidation or coercion.” First, the act of intercourse itself does not violate the Massachusetts Civil Rights statute. As the Supreme Judicial Court has noted a “direct violation of a person’s rights does not by itself involve threats, intimidation or coercion.” Longval v. Commissioner of Correction, 404 Mass. 325, 333 (1989). Instead, the defendant’s conduct must include a threat or intimation or coercion as defined by the Supreme Judicial Court. Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. 467, 474 (1994). The plaintiff does not press an argument that Senechal’s conduct constituted a threat or intimation in that there was no evidence that the plaintiff was in any way fearful or apprehensive of injury or harm. Instead, the plaintiff argues that, given her delicate psychological state and her lack of free will, Senechal’s sexual advances constituted coercion. Coercion, for the purposes of this statute, has been defined as “the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.” Id. at 474. See also Delaney v. Chief of Police of Wareham, 37 Mass.App.Ct. 398, 409 (1989) (“the act of domination of another’s will”). It is true that the coercion does not need to be physical and it is likely that an act which constitutes psychological coercion would be sufficient. Nor does the coercion have to be “overtly harmful or frightening” to the plaintiff. Reproductive Rights Network v. President of the University of Massachusetts, 45 Mass.App.Ct. 495, 507 (1998). Still, there must be some act by the defendant which, objectively viewed, would cause a person into not exercising a constitutional right or in depriving such a right. For example, a substantial show of police force blocking access to a building might well violate ones First Amendment rights under the Federal Constitution. Id. at 507-08.
In this case, the plaintiff can point to no action on the part of Senechal that constituted, when viewed objectively, coercion. It may well be, given the plaintiffs damaged psychological state that she was unable to control her own sexual impulses and had no free will to resist any sexual advances by Senechal. The standard for coercion, however, is an objective one. Planned Parenthood League of Massachusetts Inc. v. Blake, 417 Mass. at 474. Here the plaintiff points to no action by Senechal that a reasonable person would take as attempting to overbear the will of the plaintiff. Even though the plaintiff was in no psychological state to consent, her psychological disability made her, at least objectively, an extremely willing sexual participant. According to the allegations, Senechal abuses his position of authority in a most heinous fashion. Nevertheless, improperly taking advantage of a situation does not constitute coercion. Therefore, the plaintiffs claims under the Massachusetts Civil Rights Act must fail and summary judgment must be granted' as to Counts VII, XIII, XXIV, XXX and XXXVI.
Forty-Two U.S.C. Section 1983
The plaintiff asserts similar claims pursuant to the famous Federal Civil Rights statute, 42 U.S.C. Section 1983. As most law students know, one must establish that one’s violation of a federal constitutional or statutory right has been deprived by “color of state law” in order to state a claim under 1983. This is the so-called “state action” requirement. Usually the establishment of state action is a straight forward matter. The defendant either constitutes a state, county or municipal institution or the person is an agent for some state, county or municipal department, or for institution. The difficulty in application of the state action requirement comes in cases such as this when one has the litigation-provoking problem of a private entity that is so controlled by the state as to make its actions smack of state action. This problem increasingly arises as various states outsource traditional governmental *356 functions to private contractors. The Westlake facility was not only heavily funded by the Massachusetts Department of Mental Health (acquiring 90% of its funding comes from that entity) but also was extensively regulated by the department. Westlake contracted with Massachusetts Department of Mental Health and, thus, subjected itself to the detailed requirements set forth in state regulations for intensive residential treatment programs. The fact that the state extensively regulates a school or that an entity is almost exclusively funded by a state entity does not, in and of itself, convert a private entity into a state actor. Rendell-Baker v. Kohn, 457 U.S. 842 (1982); Robert S. v. City of Philadelphia, 200 WL 288111(E.D. Pa.); Philips v. Youth Development Program, Inc., 390 Mass. 652 (1983). Despite the extensive regulation of such details as capacity and eligibility for the Westlake program, there is no allegation that the Commonwealth of Massachusetts either directly or through its regulations caused the alleged sexual abuse to occur. Thus, the alleged wrong was not “required or substantially influenced by state policy or regulation or by [Westlake] contract with the state.” Phillips v. Youth Development Program Inc., 390 Mass. 652, 655.
The Supreme Judicial Court has summarized the relevant test in this area: “Unless the private entity is performing a traditional and exclusive state function, the focus must be on whether government action was involved in the particular conduct that is challenged as wrongful.” Id. at 656. Because the Commonwealth had no involvement in the alleged wrongful conduct, the only remaining issue is whether Westlake was performing a “traditional and exclusive state function” when it housed the plaintiff for civil commitment. Massachusetts law does require the Department of Mental Health to provide services of the type furnished by Westlake to the plaintiff. Indeed, in its contract with the Department of Mental Health, Westlake terms itself a Department of Mental Health facility and admits that it was acting on behalf of the Department of Mental Health. The United States Supreme Court, however, has adhered to a strict definition of what constitutes a function that is the “traditionally the exclusive prerogative of the state.” See Blum v. Yaretsky, 457 U.S. 1014 (1982). For example, running a detention facility or hiring physicians to provide prison health care are areas that are traditionally the exclusive prerogative of the state. See West v. Atkins, 47 U.S. 42 (1988). Providing education for maladjusted high school students who could not be serviced by traditional public schools is not considered to be the traditional and exclusive prerogative of the state. Rindell-Baker v. Kohn, supra.
The present case somewhat straddles the case law in this area. The Department of Mental Health is required to provide services for mentally ill adolescents who are wards of the state. The department does so by contracting with private entities and extensively controlling those private entities. Indeed, those private entities are considered for purposes of state regulation to be Department of Mental Health facilities. The facility in question here was not a prison or correctional institution but was far from a private school. Westlake was a lock-down facility for civilly committed mentally ill adolescents. Traditionally, states have provided mental health hospitals for their citizens. It is true that this is not an exclusive state function, after all there have always been private sanatoriums. Nevertheless, the treatment of the indigent mentally ill has been considered an exclusive and traditional state function. In the present case, the plaintiff was indigent, was mentally ill, and, thus, the program at Westlake appears to have performed a function that is “traditionally the exclusive prerogative of the state.” In this situation, all the acts of the entity are then considered state actions. Jackson v. Metropolitan Edison Co., 419 U.S. 345, 353 (1974). See also Milonis v. Williams, 691 F.2nd 931 (10th Cir. 1982) (cited approvingly by the Supreme Judicial Court in Phillips).
This court’s conclusion is buttressed by the fact Westlake Academy, being an intensive residential treatment program, was in essence a lock-down psychiatric hospital. The primary purpose of Westlake Academy was to provide “residential, clinical and psychiatric services to youth in a secure setting.” See Service Contract (Exhibit I to plaintiffs opposition). The teenagers admitted to the Westlake program were committed under the civil commitment laws for psychiatric treatment and all clients who entered the Westlake program were screened and assigned to the program by a centralized department of mental health intake process. Contrast Robert S. v. City of Philadelphia, 2000 WL 288 111 (private non-profit residential treatment facility providing services for sexual offender adolescence not considered state action when the facility had full discretion over which applicants it chose to admit, the facility was not a lock-down facility, and adolescence was not involuntarily committed). In addition, this is a case involving alleged abuse to one of the clients assigned to Westlake through the centralized state department of mental health intake process. This is considerably different that the type of employment or personnel dispute involved in Rendall-Baker v. Kohn, 457 U.S. 834. The state does not regulate the internal employment practices of a program such as Westlake Academy, but does strictly regulate the treatment of clients. For example, Massachusetts regulations specify a maximum length of stay, the location at which an intensive residential treatment program should be provided, the minimum staffing requirements to ensure the safety of the clients and the need to segregate the adolescent clients from any adults in-patient mental health ward. As the defendants admit in their answers to interrogatories Westlake Academy was “operated by [defendant] Health and Education Services, Inc. for the Department of Mental Health.” It is telling that a facility such as Westlake Academy is designated in the Massachu *357 setts Regulations as a facility “under the control of the department.” 104 C.M.R. 2.14(4). At least when it comes to the care of clients who have been involuntarily assigned to the secure lock-down facility of an intensive residential treatment program by way of a centralized intake process, Westlake Academy and Health and Education Services, Inc. were acting on behalf of the Department of Mental Health and, thus, may fairly be considered state actors.
Claims for Emotional Distress
The plaintiff has made claims against the defendants for both intentionally inflicted and negligently inflicted emotional distress. Various of the defendants have moved for summary judgment on these claims. Summary judgment must be denied as there exists genuine issues of fact.
The plaintiff alleges that defendants Johnston, Mosher and Hovestadt inflicted emotional distress as a result of their intentional or reckless acts. This is a theory of direct liability. These defendants argue that there is insufficient evidence of intentional or reckless conduct sufficient to establish the tort of intentional infliction of emotional distress. The plaintiff vigorously disagrees. There is sufficient evidence produced by the plaintiff to indicate that this is a claim which should go to a jury. Johnston, Mosher and Hovestadt were all in a supervisory capacity to Senechal. These defendants were aware of the vulnerability of the plaintiff to a male interested in having sexual relations. There is evidence that certain of these individual defendants were notified that the plaintiff had acted in a sexually inappropriate or provocative way towards Senechal. There is also evidence that these defendants failed to adhere to a policy (established after Westlake Academy had a similar problem of a counselor having sex with a female client). That policy prohibited a male counselor from alone transporting a female client. Nevertheless, these defendants allegedly permitted Senechal, despite all these circumstances, to transport the plaintiff. Given all these facts, a juiy could well conclude that these individual defendants acted in an outrageous or reckless manner sufficient to impose liability under the intentional infliction of emotional distress tort.
The plaintiff also asserts that Westlake and Health and Education Services, Inc. are liable for the intentional infliction of emotional distress (and the negligent infliction of emotional distress) on a vicarious liability theory. First, the plaintiff asserts that the employers of Senechal (Westlake and Health and Education Services, Inc.) are responsible for the acts of their agent while he was within the scope of his employment. This argument must fail. It is undoubtably true that the alleged sexual abuse (i.e. intercourse with the plaintiff) occurred while defendant Senechal was performing duties for his employer. After all, the sexual assault allegedly occurred while Senechal was transporting the plaintiff from Westlake Academy to a bus station in Boston in accordance with a directive of his employer. The sexual intercourse allegedly occurred in a parking area along the designated route. Thus, the alleged sexual assault occurred “substantially within the authorized time and space limits” of Senechals employment. Wang Laboratories, Inc. v. Business Incentives Inc., 398 Mass. 854, 859 (1986). Nevertheless, Westlake and Health and Education Services, Inc. are not liable for it’s agents acts as sexual intercourse the kind of activity, obviously, that Senechal was “employed to perform” and such sexual relations were not “motivated at least in part, by a purpose to serve the employer.” Id. In these circumstances, the employer is not vicariously liable for a sexual assault committed by an employee even when that employee is “on the clock.” See Worcester Insurance Company v. Fells Acres Day School, Inc., 408 Mass. 393, 405 (1990) (day care center not vicariously liable for the sexual assaults and batteries by care givers upon students).
The plaintiff, in an alternative argument to impose vicarious liability, requests that this court extend the so-called “common carrier” liability that imposes significantly greater responsibility upon common carriers, common inn keepers, and the like for the negligence or willful acts of their employees. “A carrier is under an obligation to use a very high degree of care to prevent injuries that might be caused by the willful misconduct of others. And the application of the rule to injuries caused by servants of the carrier while engaged in the performance of his contract of carriage, it is held that he is liable absolutely for their misconduct.” Gilmore v. Acme Taxi Co., 349 Mass. 651, 653 (1965). Massachusetts common law recognizes á variety of special relationships that impose affirmative duties of care, the common carrier standard being “the very highest approaching that of an insurer.” Worcester Insurance Co. v. Fells Acre Day School, Inc., 408 at 406. The Supreme Judicial Court has refused to impose common carrier liability on group day care centers. Id. If the high standard of common carrier liability was not to be extended to a group day care facility (where the children are plainly at the mercy of their alleged day care providers and have no ability to leave) it is difficult to conceive of how this common carrier rule should be extended to a secure mental health facility for mental ill adolescence.
Nevertheless, there are other “special relationships” that impose affirmative duties of care beyond that of the traditional employer-employee liability. For example, a college has a duty to protect resident students, Mullins v. Pine Manor College, 389 Mass. 47, 54 (1983). A theater owner has a duty to protect patrons, Lawson v. Massachusetts Operating Co., 328 Mass. 558, 560 (1952), and other jurisdictions have recognized a duty of a hospital to protect a plaintiff foreseeable harm from a third person. See Strokes v. Heritage House Childrens Center of Shelbyville, Inc., 547 M.E.2nd 244, *358 253 Ind. (1989); Bradley Center Inc. v. Wessner, 250 GA 199, 201-02 (1982). See generally Irwin v. Ware, 393 Mass. 745, 760-62 (1984). The theory behind imposing tort liability based upon a “special relationship” between the plaintiff and the defendant has been explained as follows: “While several different categories of such special relationships are recognized in the common law, they are based to a large extend on a uniform set of considerations. Foremost among these is whether a defendant reasonably could foresee that he could be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so.” Id. at 756. The present case appears to be a classic one in which to impose such a “special relationship” between the involuntarily committed mentally ill adolescent and the facility. In this case the plaintiff has produced a significant amount of evidence that would put Westlake and Health and Education Services, Inc. on notice that they could reasonably foresee a need to take affirmative action to protect the plaintiff from reasonably foreseeable harm caused by one of the facilities’ employees. Therefore, on the basis of this “special relationship” vicarious liability is available. Therefore, this court denies the plaintiffs motion for summary judgment on the Counts alleging an infliction of emotional distress against defendants Westlake and Health and Education Services, Inc.
Summary judgment must also be denied as to the counts alleging the negligent infliction of emotional distress. The plaintiff has produced sufficient evidence of physical harm resulting from the emotional distress. The requisite physical manifestations of emotional distress include headaches, diarrhea, or heart palpitations. Selvin v. Boston Gas Co., 414 Mass. at 439 (1993). Far more than headaches, the plaintiff here has provided evidence that she was actually hospitalized for depression as a result of the defendants activities. Such hospitalization does provide sufficient “objective corroboration of the emotional distress alleged” to survive a summary judgment motion.
Other Counts
Various of the defendants also challenge the negligent hiring, supervision, and access claims. Other than the negligent hiring claim already discussed against defendant Johnston, the plaintiff has easily produced sufficient evidence to establish that there are genuine issues of material fact to be resolved by a jury as to these claims.
Conclusion
For the reasons set forth above, the defendant’s motion for partial summary judgment is allowed in part and denied in part. It is allowed without prejudice as to Count I. It is allowed with prejudice as to those Counts alleging violations of the state’s civil rights act, namely, Counts VII, XXIII, XXIV, XXX and XXXVI. It is allowed without prejudice as to Count XV which alleges that Jeffrey Senechal committed negligence by sexually abusing the plaintiff. It is allowed with prejudice as to only that portion of Count XX which alleges negligent hiring on the part of Robert Johnston. The motion is denied in all other respects.