## COMMONWEALTH *vs.* COLEMAN GORDON.

No. 96-P-1892.

Middlesex. October 7, 1997. - January 28, 1998.

Present: WARNER, C.J., KASS, & LENK, JJ.

*Jury and Jurors. Intimidation of Juror. Words,* "Intimidation."

At the trial of an indictment for wilfully endeavoring to influence a juror by means of intimidation, in violation of G. L. c. 268, § 13B, evidence of the defendant's conduct toward a juror in a criminal case, which the defendant conceded was an improper attempt to influence the juror and which caused the juror to appear "nervous," "scared," and "afraid," was sufficient to warrant the trier of fact to conclude that the juror was intimidated. [234-237]

INDICTMENT found and returned in the Superior Court Department on September 21, 1995.

The case was heard by *Robert A. Barton,* J.

*Richard J. Shea* for the defendant.

*Marguerite T. Grant,* Assistant District Attorney, for the Commonwealth.

WARNER, C.J. After a bench trial in the Superior Court, the defendant was convicted of willfully endeavoring to influence a juror by means of intimidation, in violation of G. L. c. 268, § 13B. The sole issue raised on appeal is the sufficiency of the evidence on the element of intimidation. We affirm.

The judge could have found the following facts beyond a reasonable doubt. See *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), *S.C.,* 423 Mass. 129 (1996). In January, 1992, nineteen year old Kristina Buonapane was selected to sit as a juror in the murder trial of Ventry Gordon, the defendant's son, and four other men. For approximately three weeks, the defendant attended the trial regularly. After the close of court each day, Buonapane waited just inside the courthouse until her mother arrived to pick her up.

On January 23, the defendant, then thirty-eight years old, and an unidentified woman approached Buonapane as she waited for her ride. Buonapane overheard the defendant instruct the woman to leave. He then approached Buonapane and stood very close, only an inch or two away, identified himself, and said: "I've had my eye on you since day one; you're a juror on the [murder] case." As a result of these comments, Buonapane became "nervous," and "scared," and walked away from the defendant. He followed her, however, and again stood uncomfortably close. He subsequently rolled his eyes, looked her over "from top to bottom," and told her she was "a fine thing." He also asked Buonapane her age, where she lived, and whether she had a boyfriend. He then commented that she was "awfully young" to be sitting on a murder case.

The defendant next asked Buonapane whether she had seen the movie "Juice," to which she responded that she had not. He described the film as "crazy, [with a] lot of killing and stabbing," and suggested that she see it. He then told her that Ventry Gordon was his son, "a good kid [who] didn't do anything [or] kill anyone." He further stated "this whole thing is crazy," and explained that his son simply "went out one night, and this is what happened." Finally, the defendant said that his son was in the army, and that he wanted him to return to Germany.

About this time, Todd and Judy McKie, the parents of one of the victims, and their friend, David Caras, exited the courtroom. Caras observed the defendant talking with Buonapane. He also noticed that Buonapane appeared "alarmed" and "frightened." When the defendant saw Caras, he hastily left the building, waving to Buonapane as he left. Since he recognized Buonapane as one of the jurors, Caras reported the incident to police. Buonapane was subsequently dismissed from the jury, and a warrant was issued for the defendant's arrest. The defendant did not attend the proceedings after being observed by Caras, however, and was not arrested until approximately three years later.

The defendant contends that the judge erred in denying his motion for a required finding of not guilty because the evidence was insufficient to persuade any rational trier of fact that he intimidated Kristina Buonapane. See *Commonwealth* v. *Latimore*, 378 Mass. at 677. We disagree.

General Laws c. 268, § 13B, as appearing in St. 1990, c. 369, provides, in relevant part:

"Whoever, directly or indirectly, willfully endeavors by means of . . . misrepresentation, intimidation, force or threats of force to influence, impede, obstruct, delay or otherwise interfere with any witness or juror in any stage of a trial or other criminal proceeding . . . shall be punished . . . ."

In order to establish a violation of the statute in this case, it was necessary for the Commonwealth to prove (1) that Buonapane was a juror in a criminal trial; (2) that the defendant wilfully endeavored to influence her; (3) that he did so by means of misrepresentation, intimidation,[1] force, or threats of force[2]; and (4) that he did so with the specific intent to influence her as a juror.[3] See *Commonwealth* v. *Conley*, 34 Mass. App. Ct. 50, 53 (1993). It is beyond dispute that on or about January 23, 1992, Kristina Buonapane was a juror in a criminal trial. Moreover, the defendant admits that he knew Buonapane was a juror, and that he improperly attempted to influence her in that capacity. He maintains, however, that because he did nothing that could be construed as a threat, his actions did not amount to intimidation.

Webster's Third New International Dictionary 1184 (3d ed. 1993) defines intimidate as "to make timid or fearful: inspire or affect with fear." Within the context of G. L. c. 12, § 11H, the Massachusetts Civil Rights Act, our Supreme Judicial Court has similarly defined the concept of intimidation as "putting in fear for the purpose of compelling or deterring conduct." *Planned Parenthood League, Inc.* v. *Blake*, 417 Mass. 467, 474, cert. denied, 513 U.S. 868 (1994). Neither definition includes the requirement that to intimidate another, an individual must somehow place that person in fear or apprehension of actual harm. Conversely, a threat does "involve[] the intentional exer-

---

[1] At trial, the Commonwealth proceeded on a theory of intimidation.

[2] Compare *Commonwealth* v. *Belle Isle*, *ante* 226, 229 (1998), in which we considered the sufficiency of the evidence in support of the defendant's conviction under the same statute, where the prosecution proceeded on the theory that the defendant used force to interfere with a "person [attempting to] furnish[] information to a criminal investigator." G. L. c. 268, § 13B.

[3] The defendant also suggests in his brief that conviction under G. L. c. 268, § 13B, requires proof not only of the specific intent to influence a juror, but also of the specific intent to accomplish that goal by means of intimidation. Our cases, however, have never imposed such a requirement. See *Commonwealth* v. *Conley*, 34 Mass. App. Ct. 50, 53 (1993).

tion of pressure to make another fearful . . . of injury." *Ibid.* *Delaney* v. *Chief of Police of Wareham*, 27 Mass. App. Ct. 398, 409 (1989) (threats defined as "acts or language by which another is placed in fear of injury or damage"). Thus, although "intimidation" has not expressly been defined for purposes of G. L. c. 268, § 13B, we think the defendant's behavior, while not overtly threatening, falls well within both the generally accepted meaning of "intimidation," see *Commonwealth* v. *Belete*, 37 Mass. App. Ct. 424, 425 (1994) (criminal statutes must give " 'clear warning' of the particular conduct which is proscribed"), and the established perimeter of the statute. Cf. *Commonwealth* v. *Potter*, 39 Mass. App. Ct. 924, 925 (1995) (single telephone call to witness's place of employment during early morning hours, during which defendant asked her if she enjoyed being stalked and began to laugh, constituted intimidation for purposes of G. L. c. 268, § 13B); *Commonwealth* v. *Burt*, 40 Mass. App. Ct. 275, 275-277 (1996) (defendant's comment to witness in courthouse lobby that he knew what kind of car her daughter drove evidence of intimidation).

To recapitulate here, the defendant, a thirty-eight year old man, approached Buonapane while she was standing alone in the courthouse lobby, stood inches away from her, and commented on her obvious youth and physical appearance. He indicated that he recognized her as one of the jurors in his son's case and said he had been watching her throughout the trial. He asked her age, place of residence, whether she had a boyfriend, and suggested that she see "Juice," a film he described as extremely violent. When Buonapane attempted to move away, the defendant followed, and again stood uncomfortably close to her, all the while continuing to profess his son's innocence. The defendant admitted that he did all of this with the intent to influence Buonapane. As a result of his actions, Buonapane became "nervous," "scared," and "afraid." Finally, when the defendant was observed by David Caras, he hastily left the courthouse and thereafter did not return.

In the circumstances, the defendant's subjective intent is not relevant. It is sufficient that a reasonable fact finder could have inferred from the circumstances that he did, indeed, intimidate her. We think a reasonable woman in Buonapane's situation would have been intimidated. See *Planned Parenthood League, Inc.* v. *Blake*, 417 Mass. at 475, quoting from *Commonwealth* v.

*De Vincent*, 358 Mass. 592, 595 (1971) (threat must be tested objectively).

*Judgment affirmed.*