NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-1408                                        Appeals Court


A.T.  vs.  C.R.


No. 14-P-1408.

Essex.      June 3, 2015. - October 16, 2015.

Present: Cypher, Berry, Meade, Hanlon, & Blake, JJ.[1]


Civil Harassment. Harassment Prevention. Statute,
    Construction. Intent. Evidence, Intent. Jurisdiction,
    Juvenile Court. Juvenile Court, Jurisdiction.
    Constitutional Law, Sentence, Cruel and unusual punishment.
    Words, "Intimidation," "Threat."



Complaint for protection from harassment filed in the Essex
County Division of the Juvenile Court Department on May 23,
2014.

The case was heard by Garrett J. McManus, J., and a motion
for a new trial was considered by him.


Janice Bassil (John E. Oh with her) for the defendant.
Charlene A. Caldeira (Stephen MacKenzie with her) for the
plaintiff.

---

[1] This case was initially heard by a panel comprised of
Justices Meade, Hanlon, and Blake. After circulation of the
opinion to the other justices of the Appeals Court, the panel
was expanded to include Justices Cypher and Berry. See Sciaba
Constr. Corp. v. Boston, 35 Mass. App. Ct. 181, 181 n.2 (1993).

HANLON, J. After a hearing, a judge of the Juvenile Court extended a harassment prevention order against the juvenile defendant. See G. L. c. 258E, §§ 2-4. The defendant appeals, arguing, among other things, that the plaintiff did not present sufficient evidence of harassment under the statute and that the Legislature did not intend for the harassment prevention statute to apply in circumstances such as these. We affirm.

Background. The judge stated at the beginning of the hearing that he had reviewed the affidavit filed by the plaintiff and her father at the time of an earlier, ex parte hearing.[2] G. L. c. 258E, § 5. He then heard testimony from both the plaintiff and the defendant. He made it clear in his findings that he found the plaintiff credible; the essential underlying facts are not in dispute.

At the time of the incidents, the defendant was eleven years old and in the sixth grade at a small private school; there were only twelve students in his class, and the plaintiff was one of them. The parties had been friends for two years and had become "boyfriend and girlfriend" within the week preceding the events at issue. On March 21, 2014, the defendant contacted the plaintiff through a telephone video chat program called

---

[2] See Frizado v. Frizado, 420 Mass. 592, 597 (1995) ("A defendant or his counsel should be given adequate opportunity to consider any affidavit filed in the proceeding on which the judge intends to rely before being required to elect whether to cross-examine the complainant or any other witness").

"FaceTime."  The tone of the conversation initially was friendly, but it changed when the defendant said to the plaintiff, "Sometimes in math when I act like I'm staring at nothing I'm actually staring at your big jugs of milk."  This made her "[s]ad and afraid," "angry," and "embarrassed," and she hung up the telephone.  In addition, she later learned that one of the defendant's friends had been present with the defendant during the conversation and that the friend had made a video recording of it.  The friend sent her the recording a short time afterwards; she showed it to her mother, who immediately deleted it.

The day after the conversation, when both parties were walking back from physical education class, the defendant told the plaintiff that, if she showed the video recording to anyone, he would "make her life a living hell."[3]  The plaintiff testified that she was then "very scared that [the defendant] was going to do something."

The plaintiff also testified that, soon afterwards, while the class was eating lunch in the school cafeteria, she heard the defendant "telling his sexual fantasy about [her]."  On cross-examination, she clarified that the defendant's friend was relating the defendant's fantasy, with the defendant

_____

[3] When he testified at the hearing, the defendant admitted that he had made this statement.

interrupting and correcting him about details, "to make sure it was correct because it was his fantasy." While she did not remember details about the fantasy, she explicitly described it as a "sexual fantasy" and agreed with her lawyer that "[i]t had something to do with [her] body."[4] "[A]lmost [their] whole class" was seated around the table, and the "other kids [were] overhearing and saying, 'Whoa.'"

Following these incidents, the parties' parents communicated with each other, the school, and the local police department. Unhappy with the school's proposed plan for the situation, the defendant's parents voluntarily withdrew him from school and homeschooled him for the remainder of the school year. The defendant also sent, at his parents' request, a letter of apology to the plaintiff and her parents.[5]

Afterwards, on May 21, 2014, the defendant attended a school play with his mother; the plaintiff also attended, as did her mother and sisters. After the play was over, all of the students gathered outside and the defendant told one of the plaintiff's friends that "he wanted to punch [the plaintiff] in the titties." The friend repeated the statement to the

---

[4] The plaintiff said, "I think it was like he had a party in his basement, and I was a pizza delivery girl, and then we went inside, but I don't remember." Later, she agreed with the defendant's counsel that "[i]t was something that [she] didn't like that had something to do with something sexual in nature."

[5] The letter was not included in the record.

plaintiff, and then the defendant said it again, directly to the plaintiff. She walked away and "ran to [her] mom, and [they] drove home." At the hearing, the defendant admitted that he had expected the plaintiff to hear what he said. The plaintiff also testified that, on more than one occasion, the defendant referred to her as ". . . bitch," a play on her name.[6] This made her "angry and mad, upset, afraid."

Two days later, the plaintiff applied for and received an ex parte harassment prevention order against the defendant under the civil statute, G. L. c. 258E, ordering him not to abuse, harass, or contact her, and to remain away from her residence.[7] On June 20, 2014, following an evidentiary hearing at which both parties testified, the judge extended the order for one year. In response, the defendant moved for a new trial and alternative relief, supported by affidavits from his mother and rabbi. The motion was denied without a hearing.[8] This appeal followed.

---

[6] The defendant admitted in his testimony that he had used that name for the plaintiff.

[7] On May 29, 2014, the judge extended the initial ex parte order until June 20, 2014.

[8] On July 28, 2014, following the denial of his motion for a new trial, the defendant filed a motion with the single justice of this court to stay or modify the order. After a hearing, the single justice modified the order, in pertinent part, by reducing the stay away order from one hundred yards to ten yards, with additional provisions allowing the defendant to attend school, as well as extracurricular, sporting, and religious events, with certain limitations. On appeal, the

Discussion. In reviewing a civil harassment order under G. L. c. 258E, we consider whether the judge could find, by a preponderance of the evidence, together with all permissible inferences, that the defendant committed "[three] or more acts of willful and malicious conduct aimed at a specific person committed with the intent to cause fear, intimidation, abuse or damage to property and that [did] in fact cause fear, intimidation, abuse or damage to property." G. L. c. 258E, § 1, definition of "Harassment," inserted by St. 2010, § 23. See O'Brien v. Borowski, 461 Mass. 415, 420 (2012) (O'Brien); Seney v. Morhy, 467 Mass. 58, 60 (2014). The plaintiff bears the burden of proving that each of the three qualifying acts was maliciously intended, defined by G. L. c. 258E, § 1, as being "characterized by cruelty, hostility or revenge," and that each act was intended by the defendant to place the plaintiff in "fear of physical harm or fear of physical damage to property." O'Brien, supra at 427. In the determination of whether the three acts "did in fact cause fear, intimidation, abuse or damage to property," it is "the entire course of harassment, rather than each individual act, that must cause fear or intimidation." Id. at 426 n.8.

---

plaintiff does not challenge the amendments to the order made by the single justice.

In finding sufficient evidence for the extension of the order, the judge found that "there [were] clearly three distinct acts of harassment.  Additionally, the defendant's description of his sexual fantasy regarding the plaintiff (with his friend's . . . help) in the presence of the plaintiff and their other classmates, as well as the defendant's name calling of the plaintiff (. . . bitch), are indicative of a cumulative pattern of harassment.  It is entirely reasonable for the plaintiff to fear continued acts of harassment at the hands of the defendant without appropriate Court intervention."  Specifically, the judge noted the following three acts:  (1) the sexual comment made during the FaceTime video chat; (2) the threat to "make your life a living hell" if she showed the video to anyone; and (3) the expressed desire to punch the plaintiff in her breasts. We agree that each of these was an act of harassment, and we note that the public recounting of the sexual fantasy could reasonably have been determined to be a fourth.

If the first incident, the FaceTime video with the sexually explicit comment, had been an isolated one, and if it had occurred in a private conversation between the parties, it is unlikely that it would be seen as an act of harassment. However, given that the comment was made in the presence of a classmate, who was videotaping the conversation, it becomes something very different -- a humiliating and intimidating

moment, capable of repetition on social media indefinitely, and part of a larger pattern of harassment that continued in the following days.

The threat to make the plaintiff's life a living hell clearly was intimidation. The word "intimidation" has not been addressed specifically in earlier harassment cases. However, it appears in the statute and we note "the well-established rule of statutory construction that 'none of the words [of the statute . . .] should be regarded as superfluous.'" Lee v. Board of Appeals of Harwich, 11 Mass. App. Ct. 148, 154 (1981), quoting from Roblin Hope Indus., Inc. v. J.A. Sullivan Corp., 6 Mass. App. Ct. 481, 486 (1978). It is clear, therefore, that "intimidation" has a meaning other than "fear" and should be separately addressed. In so doing, the definitions supplied by the courts in other contexts are useful. See Commonwealth v. Gordon, 44 Mass. App. Ct. 233, 235 (1998) (Gordon) ("Webster's Third New International Dictionary 1184 [3d ed. 1993] defines intimidate as 'to make timid or fearful:  inspire or affect with fear'"). In Gordon, supra, quoting from Planned Parenthood League, Inc. v. Blake, 417 Mass. 467, 474, cert. denied, 513 U.S. 868 (1994), we explained that, "[w]ithin the context of G. L. c. 12, § 11H, the Massachusetts Civil Rights Act, our Supreme Judicial Court has similarly defined the concept of intimidation as 'putting in fear for the purpose of compelling

or deterring conduct.' . . . Neither definition includes the requirement that to intimidate another, an individual must somehow place that person in fear or apprehension of actual harm."

In this case, however, the defendant's threat to make the plaintiff's life a living hell also falls within the court's definition of a "true threat" as described in O'Brien, 461 Mass. at 424. Specifically, the court explained,

> "A true threat does not require 'an explicit statement of an intention to harm the victim as long as circumstances support the victim's fearful or apprehensive response.' [Commonwealth v. Chou, 433 Mass. 229,] 234 [(2001) (Chou)]. See United States v. Fulmer, 108 F.3d 1486, 1492 (1st Cir. 1997) ('use of ambiguous language does not preclude a statement from being a threat'); United States v. Malik, 16 F.3d 45, 49 (2d Cir.), cert. denied, 513 U.S. 968 (1994) ('absence of explicitly threatening language does not preclude the finding of a threat'). Nor need a true threat threaten imminent harm; sexually explicit or aggressive language 'directed at and received by an identified victim may be threatening, notwithstanding the lack of evidence that the threat will be immediately followed by actual violence or the use of physical force.' Chou, supra at 235. See [Virginia v.] Black, [538 U.S. 343,] 359-360 [(2003)] (defining true threats without imminence requirement); Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616, 622 (8th Cir. 2002) ('serious expression of an intent to cause a present or future harm' is true threat)."

The third act of harassment, a threat to punch the plaintiff in the breasts, is clearly an act of harassment, and it is significant in evaluating the pattern of harassment as a whole that this third act took place after the defendant had sent the plaintiff some kind of a letter of apology. Finally, the

cafeteria incident provides further evidence that the FaceTime incident was not just a dumb remark by a clueless eleven year old, but part of a pattern of conduct intended to isolate and intimidate this eleven year old girl.

The "true threat" standard enunciated in O'Brien requires that the plaintiff must have actually suffered fear, abuse, intimidation, or damage to property.  There is "no . . . reasonable person element."  O'Brien, 461 Mass. at 420.  That is, we do not ask whether a reasonable person would have been afraid in these circumstances, but whether this plaintiff actually was afraid and/or intimidated.  Her testimony, credited by the judge, was that she wanted the order extended "[b]ecause without it, [she] [felt] unsafe and afraid of him."  The affidavit also recited that the plaintiff's father had "fear for her safety from this boy."

In addition, "an essential element of civil harassment is intent. . . .  The conduct must have been intended to cause . . . abuse . . ., intimidation, fear of personal injury, or damage to property" (emphasis supplied).  Seney v. Morhy, 467 Mass. at 63, quoting from O'Brien, 461 Mass. at 427.  In most cases, because it is impossible to look into someone's mind to determine his intent, fact finders are instructed to examine the defendant's actions and all of the surrounding circumstances and then to draw reasonable inferences to determine what was the

defendant's intent. See, e.g., Commonwealth v. Blake, 409 Mass. 146, 150 (1991). In this case, the defendant's repeated and escalating harassment of the plaintiff, each time involving additional classmates, and then persisting after adult intervention, would reasonably support an inference that he intended to cause the plaintiff fear and intimidation.

However, there is no need to draw inferences here, because the defendant said explicitly what his intent was -- to make the plaintiff's life a living hell. He also explained, on more than one occasion, his motive for doing so. The plaintiff's affidavit recited that the defendant had told the plaintiff's younger brother the night before the play that "he was 'fucking with [the plaintiff]' because she ruined his life." The night of the play, he told the plaintiff that he wanted to punch her because "she ruined his life." Both of these statements support the conclusion that the defendant, in fact, intended to cause fear and intimidation and that he was motivated by hostility and revenge. See O'Brien, 461 Mass. at 426 ("To establish harassment, a [plaintiff] must prove that the defendant, motivated by cruelty, hostility, or revenge, wilfully committed three or more acts aimed at a specific person, each with the intent to cause that person to experience fear or intimidation, or to cause abuse or damage to property, which, considered together, did in fact cause fear, intimidation, abuse, or damage

to property.  G. L. c. 258E, § 1" [emphasis supplied]).  The elements of wilfulness, cruelty, and malice are further illustrated by the defendant's repeated and public use of his nickname for the plaintiff -- a play on her name ending in "bitch."

The defendant argues that "[t]he facts presented to the Court displayed the poor judgment of an eleven year old boy. They did not meet the level of criminal harassment or stalking. No delinquency charges were pursued."  That argument simply misapprehends the different standards and purposes behind G. L. c. 258E, a statute providing for a civil order of protection, and the laws labeling criminal behavior delinquent when committed by a person under the age of eighteen.

The defendant's age, eleven, certainly is a factor in determining his intent, but the Legislature provided specifically for such a determination to be an informed one by awarding to the Juvenile Court exclusive jurisdiction over G. L. c. 258E orders directed at juveniles.[9]  G. L. c. 258E, § 2.  As a result, it is fair to conclude that, when the Legislature deliberately entrusted to the trial court department most

---

[9] In addition, when the Legislature changed the age for determining who was a juvenile from under seventeen to under eighteen, § 2 of the harassment order statute was amended to reflect that change.  See G. L. c. 258E, § 2, as amended by St. 2014, c. 284, § 74.

experienced with juveniles exclusive authority to issue harassment orders against them, it had young people's limitations and abilities particularly in mind.[10]  It also is a fair inference that, had the members of the Legislature intended to put eleven year olds beyond the reach of G. L. c. 258E, they would have done so.[11]

The teaching of Miller v. Alabama, 132 S. Ct. 2455 (2012) (Miller), cited by the dissent as instructive on the issue of juvenile sentencing, does not assist this defendant.  Miller was a criminal case, in which the Court concluded that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'"  Id. at 2460.  See Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 658 (2013), where the Supreme Judicial Court, also relying upon art. 26 of the Massachusetts Declaration of Rights, came to the same

---

[10] Contrast G. L. c. 209A, § 2, under which the Juvenile Court Department has no authority to issue any such orders.

[11] Compare G. L. c. 119, § 1, as appearing in St. 2008, c. 176, § 82 ("a presumption of competency that a child who has attained the age of 12 is able to offer statements on the child's own behalf . . ."); G. L. c. 119, § 23(a), as appearing in St. 2008, c. 176, § 83 ("the department may accept a child . . . in need of foster care"; "child" defined by G. L. c. 119, § 21, as appearing in St. 2008, c. 176, § 83, as "a person under the age of 18"); G. L. c. 119, § 52, as amended through St. 2013, c. 84, § 7 ("'Delinquent child', a child between seven and 18 . . ."; "'Youthful offender', a person who is subject to an adult or juvenile sentence for having committed, while between the ages of fourteen and 18 . . .").

conclusion. In a criminal case, the court has a constitutionally imposed mandate to determine whether the sentence violates the Eighth Amendment to the United States Constitution and/or the Massachusetts Declaration of Rights. However, even in the context of a criminal murder in the second degree case, the Supreme Judicial Court recently refused to extend the Miller/Diatchenko analysis, saying,

> "although children may not have the maturity fully to appreciate the consequences of wrongful actions, 'that does not mean that a delinquent child lacks the ability to formulate the specific intent to commit particular wrongful acts.' Commonwealth v. Ogden O., 448 Mass. 798, 804 (2007). Where the Legislature has determined that a youth is capable of committing certain crimes, we have noted that 'respect for the legislative process means that it is not the province of the court to sit and weigh conflicting evidence supporting or opposing a legislative enactment.' [Citation omitted.] Here, . . . the Legislature has clearly indicated that youth in the defendant's age group are considered capable of committing murder, and the trial judge was correct to preclude the defendant from putting forward evidence that would have suggested it was impossible for anyone the defendant's age to formulate the necessary intent to commit this crime."

Commonwealth v. Okoro, 471 Mass. 51, 65 (2015) (upholding murder in second degree conviction of fifteen year old juvenile). It is not for this court to say that this eleven year old was beyond the reach of the statute.

This is a civil case, interpreting a statute, G. L. c. 258E, whose purpose is protective, not penal. The burden of proof is "preponderance of the evidence," not proof beyond a reasonable doubt. Frizado v. Frizado, 420 Mass. 592, 597

(1995).  <u>Iamele</u> v. <u>Asselin</u>, 444 Mass. 734, 736 (2005).  The judge had an opportunity at the hearing to observe both the plaintiff and the defendant, including their demeanor.  He made decisions about their credibility and issued this harassment prevention order.  A single justice of this court then reduced the distance the defendant was required to stay away from the plaintiff to ten yards.[12]  In our view, given all that has occurred, this plaintiff is entitled to that order of protection under G. L. c. 258E, commanding the defendant to stay that ten yards away from her.

<u>Harassment prevention order as modified by single justice of the Appeals Court affirmed</u>.

<u>Order denying motion for new trial affirmed</u>.

---

[12] The plaintiff does not challenge that reduction in this court.  See note 8, <u>supra</u>.

BLAKE, J. (dissenting, with whom Meade, J., joins). I respectfully dissent. In my view, the evidence was insufficient for the judge to issue a harassment protection order. In reviewing a civil harassment order, we consider whether the judge could find, by a preponderance of the evidence, together with all permissible inferences, that the defendant committed "[three] or more acts of willful and malicious conduct aimed at a specific person committed with the intent to cause fear, intimidation, abuse or damage to property and that [did] in fact cause fear, intimidation, abuse or damage to property . . . ." G. L. c. 258E, § 1, inserted by St. 2010, c. 23. See O'Brien v. Borowski, 461 Mass. 415, 420 (2012); Seney v. Morhy, 467 Mass. 58, 60 (2014). The plaintiff bears the burden of proving that each of the three qualifying acts was maliciously intended, defined by G. L. c. 258E, § 1, as being "characterized by cruelty, hostility or revenge," and that each act was intended by the defendant to place the plaintiff in "fear of physical harm or fear of physical damage to property" (emphasis supplied). O'Brien v. Borowski, supra at 427.

A victim's response to the conduct in question is viewed subjectively, as opposed to the reasonable person standard articulated in the criminal harassment statute. Compare G. L. c. 258E, § 1 (acts must "in fact cause fear, intimidation, abuse or damage to property"), with G. L. c. 265, § 43A, as appearing

in St. 2010, c. 92, § 10 (pattern of conduct or series of acts that seriously harms that person and "would cause a reasonable person to suffer substantial emotional distress"). It is "the entire course of harassment, rather than each individual act, that must cause fear or intimidation." O'Brien, supra at 426 n.8.

In finding sufficient evidence for the extension of the order, the judge relied on the following three acts: (1) the sexualized comment made during the FaceTime video chat; (2) the "make your life a living hell" threat; and (3) the expressed desire to punch the plaintiff in her breasts.

As for the third act, I agree that the threat to punch the plaintiff in the breasts meets the requirements of the statute, as it is an unambiguous threat of violence. In contrast, the remaining acts do not, in my view, overtly express or imply an intent to physically harm the plaintiff. Apart from embarrassing her and preventing her from sharing the recorded video, any further, malicious intent is unclear without testimony from the defendant about what he intended by his actions and statements. No such testimony was elicited, apart from the defendant's affirmations that he "just said things without thinking" and "without any intention of carrying out any of these things." Just as sparse is the record evidence of the plaintiff's fear of physical harm, save that she was generally

angry, embarrassed, and afraid. Critically, nowhere in the plaintiff's testimony did she articulate what she was afraid of, and the evidence is not so strong as to permit that inference on the record as it stands.

Equally important to the analysis is the fact that the defendant was eleven years old and in the sixth grade when the acts occurred. While the language of G. L. c. 258E does not delineate between adult and juvenile defendants, with the exception of jurisdiction, the age of the defendant cannot be ignored. In the context of juvenile sentencing, the United States Supreme Court has addressed the significant gaps between juveniles and adults, noting that children have a "lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking" and that "children are more vulnerable . . . to negative influences and outside pressures, including from their family and peers . . ." (quotations and citation omitted). Miller v. Alabama, 132 S. Ct. 2455, 2464 (2012) (Miller).[1]

---

[1] The Supreme Judicial Court applied the rationale of Miller in Diatchenko v. District Attorney for Suffolk Dist., 466 Mass. 655, 667-671 (2013) (Diatchenko I), again in the context of sentencing, and has cited the same principles in Doe, Sex Offender Registry Bd. No. 68549 v. Sex Offender Registry Bd., 470 Mass. 102, 115 (2014) (registration of sex offenders), and Diatchenko v. District Attorney for Suffolk Dist., 471 Mass. 12, 23 (2015) (Diatchenko II) (parole for juvenile offenders). See Watts v. Commonwealth, 468 Mass. 49, 57 & n.13 (2014) (Watts).

The defendant's intent, beyond embarrassing the plaintiff and sidestepping personal responsibility, is all the more uncertain when applying the principles set forth in Miller and its progeny.  The nature of the defendant's actions and words indeed display those traits described in Miller:  lack of maturity and sense of responsibility, leading to impulsive behavior resulting in unintended consequences.[2,3]  The defendant's lack of appreciation for and understanding of his actions is especially apparent in the sophomoric words he used (i.e., titties and jugs of milk) and the name he called the plaintiff (". . . bitch").[4]

The plaintiff counters that the sexual nature of the comments, when considered in the totality of the circumstances, must have been intended to cause the plaintiff fear, or at least, to be intimidated.  Specifically, the plaintiff contends the FaceTime incident, viewed in the context of the defendant's

---

[2] The application of these principles is even more compelling here, as the defendant was significantly younger at the time of the conduct in question than the defendants in Miller (fourteen), Diatchenko I (seventeen), and Watts (seventeen).  See Miller, 132 S. Ct. at 2461-2462; Diatchenko I, 466 Mass. at 656; Watts, 468 Mass. at 50.

[3] When asked how he felt about what happened, the defendant unconsciously admitted to being impulsive, stating that his behavior "made me feel like it wasn't who I am.  I would not do that.  Something just kind of took over me."

[4] Notably, the judge considered the plaintiff's age and maturity level in extending the order, but failed to address these same considerations as they may apply to the defendant.

subsequent pronouncement that he would make the plaintiff's life a living hell if she showed the video to anyone, is an act of harassment.  Even assuming, arguendo, that this "threat" is sufficient to constitute an act of harassment, there remains a question as to whether the defendant's prior, initial statement was made with the intent to place the plaintiff "in fear of physical harm or physical damage to property," O'Brien, 461 Mass. at 427, or was simply a statement of juvenile attempted sexual bravado or offensiveness.  There is, indeed, no evidence that the initial statement was made with intent to place the plaintiff in fear of physical harm, as O'Brien requires.  Moreover, the statute requires three acts.  The plaintiff also argues that the recitation of the defendant's fantasy is an act of harassment.  Again, without more detail about the defendant's intent and the plaintiff's response, the evidence was insufficient to conclude that this was an act of harassment.[5]

While the actions of the defendant cannot be condoned, and the fear and embarrassment felt by the plaintiff are certainly real and understandable, on this record the plaintiff has not sustained her burden of proof.  For these reasons, I dissent.

---

[5] It is telling that neither party recalled the specifics of the "pizza fantasy" during their testimony at the evidentiary hearing.