NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 106

No. 2017-146

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Criminal Division |
| | |
| Christian J. Noll | May Term, 2018 |

James R. Crucitti, J. (motion to dismiss); Dennis R. Pearson, J. (final judgment)

Sarah George, Chittenden County State's Attorney, and Zachary J. Chen, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Dawn Matthews, Appellate Defender, Montpelier, for Defendant-Appellant.

Thomas J. Donovan, Jr., Attorney General, and Benjamin D. Battles, Solicitor General, Montpelier, for Amicus Curiae Vermont Attorney General.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **ROBINSON, J.** Defendant Christian J. Noll appeals from his conviction for stalking pursuant to 13 V.S.A. § 1062 (2015). He argues that: (1) the criminal stalking statute, as it existed when he was charged, was facially unconstitutional under the First Amendment to the U.S. Constitution; (2) application of the statute to his case is unconstitutional; (3) the evidence was insufficient as a matter of law to convict him of stalking; (4) the jury instruction allowed the jury to convict based on time-barred acts; and (5) the jury instruction failed to adequately describe the parameters of the true-threat doctrine under the First Amendment. We conclude that the criminal stalking statute at the time defendant was charged was facially valid because it included within the definition of stalking only constitutionally unprotected threatening speech. The statute was

appropriately applied to defendant because, considering the evidence overall, a jury could conclude that the expression, which formed part of the stalking charge, was constitutionally unprotected threatening speech. We conclude, however, that the jury instruction allowed the jury to convict defendant based solely on acts that occurred outside of the applicable statute of limitations. On this basis, we reverse and remand for a new trial.

¶ 2. The State presented the following evidence, derived largely from the complainant's testimony, during the jury trial below.[1] Complainant and defendant met and began a romantic relationship in December 2006. In May or June 2007, after a heated argument, complainant considered their courtship over.

¶ 3. Shortly thereafter, complainant encountered defendant in a store. Upon seeing her, defendant called out that "she is a difficult one." Complainant ignored defendant, paid for her food, and left. Defendant was waiting outside of the store. Complainant explained to him that she wanted their relationship to be finished, and she then turned to walk up the street to her home. Defendant followed complainant, and the two got into a loud exchange, with complainant eventually going inside her home.

¶ 4. Subsequently, in June 2007, defendant emailed complainant and invited her to be his guest at a wedding that was to occur that September. Complainant declined. In August 2007, defendant emailed complainant and "berat[ed]" her. On the night of the wedding, defendant called complainant "sound[ing] intoxicated" and invited her to a friend's party, and again complainant declined. Later that same night, complainant was driving in Winooski when she received an incoming call from defendant's phone, which she did not answer. Complainant looked in the

---

[1] We review the denial of a motion for judgment of acquittal under Vermont Rule of Criminal Procedure 29 without deference, viewing "the evidence presented by the State . . . in the light most favorable to the prosecution and excluding any modifying evidence" to "determine whether that evidence sufficiently and fairly supports a finding of guilt beyond a reasonable doubt." State v. Lampman, 2017 VT 114, ¶ 24, __ Vt. __, 181 A.3d 54.

rearview mirror and saw defendant on the phone driving "directly behind" her. Defendant followed complainant to her home in Burlington.

¶ 5. When they arrived, defendant stomped toward complainant angrily, shoved a party favor from the wedding toward her, and told her she "could have been a better friend." Defendant began to yell that he "hate[d] [his] life" and "everybody in it," that complainant was "the only good thing in [his] life, and now [he doesn't] even have that," and that he "just want[ed] to end it all." To complainant, defendant seemed "really upset, pretty irrational, erratic." She invited defendant into her apartment because she wanted to "calm him down to get him some help." Once in the apartment, complainant sat defendant in her living room while she went into her kitchen and hid her knives. Complainant then snuck into a different room and called a friend who advised her to contact a suicide-prevention hotline. Defendant found out that complainant had made the call to her friend, and he took the phone from complainant and held it over her. After complainant demanded the phone, defendant gave it to her and ran out of the apartment.

¶ 6. In January 2008, defendant called complainant from an anonymous number wanting to know why she had deleted him as a friend on her social media account. Complainant told defendant that she did not want to talk to him or be his friend. When defendant stated that he was surprised to hear this, complainant told him to consider it his "official notice" not to contact her again, and then ended the conversation.

¶ 7. The following morning, defendant again called complainant from an anonymous number and told her that he was waiting at the college where she taught, outside of the classroom for her class scheduled that morning. This particularly concerned complainant because she was unsure how defendant knew her teaching schedule. Defendant sounded angry and said he needed to talk to her. Defendant stated that he had spoken to complainant's supervisor that morning. Complainant replied that she did not want to talk to him and hung up the phone. Complainant was "scared to death" and called her supervisor, who directed her to a hidden path onto the college campus. When complainant entered her office building, she could hear defendant on a different

3

floor yelling loudly. Complainant's supervisor met her and walked her to her office. Security then escorted defendant off campus grounds, and the college subsequently issued him a permanent no-trespass order.

¶ 8. After this incident, complainant met with the campus safety director and her supervisor to discuss a safety plan. The plan included installing a panic button in complainant's office, establishing a safe space across the hall from her office, giving her work schedule to campus safety officers, and having the officers walk her to and from her car each day. Complainant stayed with a friend for the following week.

¶ 9. In 2008, complainant requested a relief-from-abuse order against defendant in the superior court; the court denied her request.

¶ 10. The next incident occurred one evening in August 2010. At approximately 8:00 in the evening, complainant was leaving her art studio in Burlington and saw defendant in the parking lot driving very slowly and staring at her "intently . . . with a furrowed brow." The studio was located off of the street and behind a different business, which was closed at that hour, and the parking lot was empty except for defendant. Defendant sat staring at complainant for "a couple of minutes," and complainant felt "scared, surprised, alarmed." Complainant walked backward because she did not want to turn her back to defendant, went into her studio, locked the door, and waited a couple of hours for a friend to pick her up.

¶ 11. During this same time period, complainant had a website and blog for her art that allowed the public to post comments if they registered a username and password. As administrator of the website, complainant received email notifications when people posted comments. In early February 2011, complainant received notification of a comment from defendant's email address criticizing her art for being pro-military, for betraying what defendant felt were complainant's true liberal political philosophies, and for "deliberately design[ing] a painting for the sympathies of those who want to kill." The comment exclaimed, "Go kill 'em [complainant]! Maybe we'll see more killing!" When complainant saw this she felt "[u]nsafe" and was unsure what the references

4

to killing meant. Defendant posted more comments on three separate dates in April 2011. In one such comment on April 15, defendant accused complainant of vandalizing his car and "blacklisting" him from the police, and he stated that he "was over [her] when [she] didn't get [her] HIV test." The comment also referenced complainant's art piece entitled "Shoot the Terrorist"[2] and made reference to a Vermont Public Radio mug that she had designed. It also noted that she was getting married and that her new fiancé was in the armed services and might "deploy." Complainant's fiancé was in fact a member of the Vermont National Guard and had deployed to Afghanistan in 2010. The comments made complainant feel "horrible, frightened," and she actively tried to find more security for her wedding.

¶ 12. In the fall of 2014, defendant was working as a cab driver and gave one of complainant's students a ride from the college to a movie theater in South Burlington. Defendant asked whether the student knew his "ex," and the student asked whether it was complainant—who at that point was the only professor in the student's field of study. They began to converse about complainant. The student felt that defendant's "tone . . . was kind of hostile," and "[h]e mentioned that that [he and complainant] dated for quite a while, and that [complainant] was like a damsel in distress." The student felt uncomfortable with defendant and took a different cab home after the movie. The student told complainant about this encounter a short time later.

¶ 13. In 2015, defendant stood on a street corner near complainant's college and distributed copies of a self-published book. The book is an autobiography with a chapter partially devoted to defendant's relationship with complainant. The chapter discusses complainant's appearance and her attempt to get a restraining order. It accuses complainant of: perjury; turning other women that defendant had dated against him; persuading her co-workers to lodge complaints at defendant's place of employment; deliberately driving past him to flaunt her new husband;

---

[2] This painting was a satirical depiction of a New Jersey boardwalk display. During the trial, complainant testified that prior to April 2011 this painting had been shown at a local furniture store, an exhibit in Brooklyn, and possibly on her website.

refusing to get an HIV test when they dated; blocking his potential employment at her college; and vandalizing his car. The chapter explains that defendant felt "traumatized" by complainant's actions after their break up, was suffering from "Falsely Accused Syndrome," and that "[m]essy divorces have gone down cleaner." It mentions that defendant has a copy of complainant's wedding video. The chapter references her "Shoot the Terrorist" painting and goes in depth about how complainant painted the piece to " 'wow' her soon-to-be husband at the time with a 'blind faith' jump from supposed liberal 'artist' to right-wing 'pro-military.' " The chapter concludes with the following:

> [Complainant] was fully aware of all the adversity in my life and it is for that reason I believe she was trying to put layer upon layer of stress on me as to try to discover a "breaking point." In fact, that's exactly what she was trying to do.
>
> We are now in the fall of 2014 and I still have [complainant's] followers "Artistically" vandalizing my car weekly (yes still). [Complainant] has everything to do with it.
>
> Shoot the terrorist?
>
> Or shoot the "artist?"
>
> Neither are present . . .

After seeing this book, complainant felt "[a]bsolutely threatened that [defendant] was going to follow through on the act of shooting [her]," and that "[a]ll these years [she had] wondered when [defendant's] breaking point was, and this felt like it was a little bit closer." Complainant notified campus safety and the Burlington Police Department, and she secured a two-year relief-from-abuse order against defendant from the superior court.

¶ 14. In June 2015, the State charged defendant by information alleging that he "on or about and between 2008 and 2015, intentionally stalked another person, to wit, by repeatedly harassing [complainant], in violation of 13 V.S.A. § 1062."[3]

---

[3] The State's amended information provides more specificity:

6

¶ 15.   In September 2016, defendant moved to dismiss the charge under Vermont Rule of Criminal Procedure 12(d), arguing, among other things, that the criminal stalking statute was facially unconstitutional as it existed at the time he was charged because it premised liability "solely on how acts would be interpreted by a reasonable person, regardless of the defendant's mental state," which ran afoul of Elonis v. United States, __ U.S. __, 135 S. Ct. 2001 (2015).  The trial court denied this motion, explaining that the statute required the actor to have "intentionally stalk[ed] another person," and, to avoid constitutional infirmities, the court read the state-of-mind requirement that a defendant act "intentionally" to apply to all elements of the statute.

¶ 16.   Defendant stood trial over two days in February 2017.  At the close of the State's evidence, defendant moved for a judgment of acquittal under Vermont Rule of Criminal Procedure 29, arguing that his speech toward complainant was not a true threat and was thus protected under the First Amendment.  In addition, defendant contended that the State had failed to show conduct that met the statutory elements for stalking within the three-year statute of limitations, 13 V.S.A. § 4501, from when defendant was charged in June 2015.

¶ 17.   The court denied this motion. Regarding the statute of limitations, the court held that if there was at least one event within the overall course of conduct that occurred within the limitations period, the State could bring the charge.  The court concluded that defendant's 2015 dissemination of his book met this requirement.  Regarding defendant's true-threats argument, the court ruled that through his entire course of conduct, defendant committed multiple acts that would

---

[Defendant], in the County of Chittenden, at Burlington, on or about and between 2008 and 2015, intentionally stalked another person, by purposefully engaging in a course of conduct directed at a specific person which consists of harassing [complainant], which included repeatedly showing up at [complainant's] place of work and repeatedly contacting [complainant's] co-workers and students about [complainant], and writing blog posts and books which alluded to killing [complainant], which serves no legitimate purpose and would cause a reasonable person to fear for her physical safety or would cause a person substantial emotional distress, in violation of 13 V.S.A. § 1062.

cause a reasonable person to fear for their safety, including his actions at complainant's college in January 2008, his following complainant in a remote parking lot in 2010, and his dissemination of the book in 2015. Defendant did not present any evidence.

¶ 18. The court's jury instruction provided that:

[T]he first essential element is that defendant is a person who committed the alleged acts.

The second essential element is that defendant . . . intentionally engaged in a course of conduct, the purpose of which was to harass [complainant]. A person acts intentionally if he or she acts deliberately, knowingly, and purposely. The purpose for and intent with which a person does an act may be shown by the way in which the person expresses it to others, or by the nature of his or her conduct. In determining [defendant's] intent and purpose for his actions, you should consider all of the surrounding facts and circumstances established by the evidence.

A course of conduct means a pattern of conduct consisting of two or more acts over a period of time, showing a continuity of purpose.

Harassing another means actions directed at a specific person which would cause a reasonable person in similar circumstances to fear unlawful sexual conduct, unlawful restraint, bodily injury, or death. The actions which may constitute harassment include, but are not limited to, verbal threats, written, telephonic or other electronically communicated threats, or conduct without consent. However, keep in mind that an expressed or actual threat need not have been made, so long as the act or acts would cause the stated effect on the reasonable person.
. . . .

Finally, it is the entire course of conduct of two or more acts committed by [defendant] which you must consider as meeting all of the requirements and stated elements of the crime, even if a particular event or incident in that course of conduct does not necessarily satisfy all of the required elements. If the State has proven all of the essential elements beyond a reasonable doubt as to at least two such events or acts committed by [defendant], then you must return a verdict of guilty. However, if the State has not proven each of those essential elements of the charge of criminal stalking beyond a reasonable doubt, then you must find defendant . . . not guilty of the charge.

Both during the charge conference and after the instruction, the court overruled defendant's objection that the instruction allowed the jury to convict based on two acts that occurred outside of the applicable limitations period.

¶ 19. After the jury returned a guilty verdict, the court sentenced defendant to six months to one year to serve, all suspended except for thirty days, with the balance to be served on probation. On appeal, defendant contends that: (1) the criminal stalking statute in 2015 was facially unconstitutional; (2) the statute was unconstitutional as applied; (3) the evidence was insufficient; (4) the jury instruction allowed the jury to convict based on time-barred acts; and (5) the jury instruction failed to adequately describe the parameters of true threats. We address each argument in turn.

I. Facial Constitutionality of 13 V.S.A. § 1062 (2015)

¶ 20. Defendant argues that at the time that he was charged with stalking in June 2015, 13 V.S.A. § 1062 was unconstitutional on its face.[4] The statute was overly broad, he contends, because it "criminalized harassing behavior resulting in 'substantial emotional distress,' " thereby proscribing constitutionally protected speech. And defendant argues in his reply brief that even if we construe the statute to apply only to constitutionally unprotected threatening speech, the statute was impermissibly limited to threats that caused a reasonable person "substantial emotional distress"—a class of threats impermissibly defined with reference to the content of the threats.[5]

---

[4] In 2016, the Legislature amended several definitions in the stalking statute effective July 1, 2016. 2015, No. 162 (Adj. Sess.), § 5. The amended version of the statute that is currently in effect does not apply in this case, so we do not consider it. All citations in this opinion to 13 V.S.A. §§ 1061-1062 refer to the version effective in 2015.

[5] The State contends that although defendant raised a facial challenge in the trial court concerning the statutory intent requirement, he did not raise the arguments he now presents on appeal, and thus he failed to preserve his argument. Although we note that this Court will often decline to entertain a constitutional challenge that a party failed to raise below, see, e.g., State v. Hinchliffe, 2009 VT 111, ¶ 31, 186 Vt. 487, 987 A.2d 988 ("Even when defendant asserts a violation of constitutional rights, failure to promptly raise the issue before the trial court results in waiver." (quotation omitted)), we may, in our discretion, entertain a facial challenge premised on different grounds than those specifically raised below. See State v. Johnson, 524 S.W.3d 505, 511 (Mo. 2017) (explaining that court has discretion to reach challenges to constitutional facial validity

¶ 21. The facial constitutionality of a statute is a legal question that we review without deference. State v. Tracy, 2015 VT 111, ¶ 14, 200 Vt. 216, 130 A.3d 196. We construe statutes to effectuate the Legislature's intent, with our primary guidepost being the statute's plain language. State v. Dixon, 169 Vt. 15, 17, 725 A.2d 920, 922 (1999). We afford statutes a presumption of constitutionality. State v. Read, 165 Vt. 141, 147, 680 A.2d 944, 948 (1996). A facial challenge to a statute based on the First Amendment can succeed only "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." United States v. Stevens, 559 U.S. 460, 473 (2010).

¶ 22. Applying these standards, we conclude that 13 V.S.A. § 1062 was facially constitutional. "True threats" are not constitutionally protected, and the expression potentially targeted by the statute's definition of "harassing" consisted primarily, if not completely, of true threats. Moreover, the statute's application to only those threats that reasonably cause substantial emotional distress does not offend the First Amendment.

¶ 23. The First Amendment to the U.S. Constitution, applicable to the states though the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." U.S. Const. amends. I, XIV; Thornhill v. Alabama, 310 U.S. 88, 95 (1940). Generally, the First Amendment prohibits the state from "restricting expression because of its message, its ideas, its subject matter, or its content." State v. Albarelli, 2016 VT 119, ¶ 36, 203 Vt. 551, 159 A.3d 627 (quotation omitted). But this general prohibition of content-based restrictions on expression is not absolute. The U.S. Supreme Court has recognized that certain narrow and well-defined classes of expression carry so little social value that the state can prohibit and punish such expression. Connick v. Myers, 461 U.S. 138, 147 (1983).

---

of statute not raised below); Hill v. Urbana, 679 N.E.2d 1109, 1112 (Ohio 1997) (stating that courts have discretion in implementing waiver doctrine to reach unpreserved claims). We agree that the bases for defendant's challenge to the facial validity of the statute have evolved since he argued before the trial court. However, we exercise our discretion to reach this issue because of the liberty interests of the parties involved and the important potential ramifications for future facial challenges to the current version of the stalking statute.

¶ 24.    In <u>Virginia v. Black</u>, the Supreme Court reaffirmed that among the categories of expression states may regulate consistent with the Constitution are "true threats," defined to "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. 343, 359 (2003) (plurality opinion).    The Court explained that a speaker "need not actually intend to carry out the threat," because the prohibition on true threats "protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur."    <u>Id</u>. at 360 (quotations and alteration omitted).    Considering a statute proscribing intimidation through cross burning, the Court said, "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death."    <u>Id</u>.    The Court declined to strike down the statute insofar as it prohibited cross burning with the intent to intimidate, although it did strike down convictions under the statute because the statute provided that cross burning alone is facial evidence of an intent to intimidate.

¶ 25.    State and federal courts have relied on this test in construing statutes that criminalize threats and in evaluating their constitutionality.    See <u>United States v. Turner</u>, 720 F.3d 411, 421 (2d Cir. 2013) (affirming defendant's conviction for threatening judges online where evidence was sufficient to show that his statements were not "political hyperbole," but violent threats); <u>United States v. Parr</u>, 545 F.3d 491, 493-94 (7th   Cir. 2008) (affirming defendant's conviction for threatening to blow up federal building where he described his plans in great detail and had history of building bombs and supporting terrorism); <u>State v. DeLoreto</u>, 827 A.2d 671, 676-78 (Conn. 2003) (concluding that, in context, defendant's threats to "kick your punk ass" directed at two different police officers constituted true threats subject to prosecution under statute prohibiting breach of peace); <u>In re Robert T.</u>, 2008 WI App 22, ¶¶ 18-19, 746 N.W.2d 564 (evaluating statute prohibiting bomb scares and holding that true threats are not limited to express

11

threats of bodily harm or death directed at specific person or group of people); see also State v. Schenk, 2018 VT 45, ¶ 9, __ Vt. __, __ A.3d. __ (acknowledging true-threats doctrine). In short, true threats are not protected by the First Amendment, so statutes criminalizing true threats are constitutional.

¶ 26. By the plain terms of the criminal stalking statute as it existed in 2015 when defendant was charged, any expression prohibited under the statute falls within this constitutionally unprotected category of true threats. In suggesting that the statute criminalized speech solely on the basis that it would cause a reasonable person substantial emotional distress, defendant fails to consider the statute as a whole, including the definitions of conduct that could trigger the statute's application. See State v. Tierney, 138 Vt. 163, 165, 412 A.2d 298, 299 (1980) ("In construing a statute, this Court considers it as a whole, and, if possible, gives effect to every word, clause, and sentence."). The statute, 13 V.S.A. § 1062, outlawed "intentionally stalk[ing] another person."[6] "Stalk" was defined as "a course of conduct which consists of following, lying in wait for, or harassing," which "serves no legitimate purpose," and "would cause a reasonable person to fear [for the person's] physical safety or would cause a reasonable person substantial emotional distress." Id. § 1061(1). "Course of conduct" was defined as "a pattern of conduct composed of two or more acts over a period of time, however short, evidencing a continuity of purpose." Id. § 1021(4). The definition of "course of conduct" expressly excluded "[c]onstitutionally protected activity" from its meaning. Id. "Harassing" was defined as:

> [A]ctions directed at a specific person, or a member of the person's
> family, which would cause a reasonable person to fear unlawful

---

[6] The intent needed on the part of the actor to satisfy a true threat has been a topic of national debate, with some jurisdictions requiring specific intent on the part of the speaker to threaten, United States v. Bagdasarian, 652 F.3d 1113, 1116 (9th Cir. 2011), while others require general intent on the part of the speaker with the primary focus on the objective message of the speech, Turner, 720 F.3d at 420. See also State v. Cole, 150 Vt. 456, 554 A.2d 255 (1988) ("[T]he word 'threaten' includes some element of volition. A threat is a communicated intent to inflict harm on person or property."). Both the State and trial court read the state-of-mind term "intentionally" as applying to all elements of the statute, and on appeal defendant does not take issue with the intent requirement in 13 V.S.A. § 1062 as construed by the trial court. For that reason, we need not address the issue.

12

> sexual conduct, unlawful restraint, bodily injury, or death, including verbal threats, written, telephonic, or other electronically communicated threats, vandalism, or physical contact without consent.

Id. § 1061(3). The statute defined "following" as "maintaining over a period of time a visual or physical proximity to another person in such manner as would cause a reasonable person to have a fear of unlawful sexual conduct, unlawful restraint, bodily injury, or death." Id. § 1061(2). "Lying in wait" meant "hiding or being concealed for the purpose of attacking or harming another person." Id. § 1061(4).

¶ 27. Considering the statute as a whole, defendant's suggestion that it authorizes prosecution for constitutionally protected speech fails for two reasons. First, given the above definitions, a defendant could only be prosecuted under the criminal stalking statute for some combination of acts that are "harassing," "lying in wait," or "following." Defendant does not argue that "lying in wait" or "following," as defined in the statute, constitute constitutionally protected activity. And "harassing" was defined as applying only to expression that "would cause a reasonable person to fear unlawful sexual conduct, unlawful restraint, bodily injury, or death," id. § 1061(3)—expression that is mostly if not completely constitutionally unprotected because it conveys a true threat. Given that the expression potentially regulated by the criminal stalking statute is nearly, if not completely, coextensive with a category of expression that can be constitutionally prohibited, it is not the case that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Stevens, 559 U.S. at 473 (quotation omitted).

¶ 28. Moreover, and more to the point, the statute's definition of "course of conduct"— a necessary element of a stalking charge—expressly states, "[c]onstitutionally protected activity is not included within the meaning of 'course of conduct.' " 13 V.S.A. § 1021(4).

¶ 29. The constitutionally protected activity that the statute expressly excluded from its reach included speech protected by the First Amendment. Insofar as expression may be part of

the course of conduct that supports a stalking charge, it is, by definition, only that expression that is not protected by the First Amendment.[7]

¶ 30.   Nor does the fact that the Legislature limited the universe of unprotected threats that it chose to regulate to those that would cause a reasonable person to fear for physical safety or experience substantial emotional distress undermine the statute's facial constitutionality.[8]   There may be circumstances in which the state may not incorporate content-based or viewpoint-based distinctions even when regulating constitutionally unprotected categories of speech such as true threats.   See, e.g., R.A.V. v. City of St. Paul, 505 U.S. 377, 391 (1992) (holding that ordinance prohibiting constitutionally unprotected "fighting words" was unconstitutional insofar as it only applied to "fighting words" that insult or provoke violence "on the basis of race, color, creed, religion or gender").   But there is no doubt that a state may single out for regulation, without regard to subject matter or viewpoint, that constitutionally unprotected speech that causes the most severe harm.   As the U.S. Supreme Court has explained, "[w]hen the basis for the content discrimination [among various instances of a class of proscribable speech] consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists."   Id. at 388.   So, for example, "[a] State might choose to prohibit only that obscenity which is the most patently offensive in its prurience—i.e., that which involves the most

---

[7]   That the reach of this statute with respect to expression is limited to true threats is apparent from its plain language.  Thus, our conclusion on this point does not require us to engage in a narrowing construction.  Cf. Read, 165 Vt. at 146, 680 A.2d at 947 (noting that court is obligated to narrow and limit statute to avoid constitutional infirmities).

[8]   Defendant implies that the stalking statute only applies to threats that would cause a reasonable person substantial emotional distress, but the definition of "stalk" includes conduct that "would cause a reasonable person to fear his or her physical safety or would cause a reasonable person substantial emotional distress."  13 V.S.A. § 1061(1) (emphasis added).  Instances of "harassing" behavior are only cognizable as part of the requisite course of conduct if they would cause "a reasonable person to fear unlawful sexual conduct, unlawful restraint, bodily injury, or death."  Id. § 1061(3).  So, in most if not all instances in which harassing forms part of the course of conduct supporting a stalking charge, the State must prove that the expression would cause a reasonable person to fear for physical safety for the purpose of meeting the definition of "harassing"; in such cases, the State need not also show the conduct would reasonably cause "substantial emotional distress."

14

lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which includes offensive political messages." Id. Just as the Legislature may target only that obscene speech that "involves the most lascivious displays of sexual activity," id., so too may it target only true threats that would cause a reasonable person to either fear for physical safety or experience substantial emotional distress.

## II. As-Applied Challenge and Sufficiency-of-the-Evidence Challenge

¶ 31. As a practical matter, defendant's argument that 13 V.S.A. § 1062 was unconstitutional as applied to his case and his challenge to the sufficiency of the evidence to convict him under the criminal stalking statute turn on the same question: whether a jury could reasonably conclude that his 2015 dissemination of his book amounted to a true threat.

¶ 32. As noted above, § 1061 required a "course of conduct," defined as "a pattern of conduct composed of two of more acts over a period of time, however short, evidencing a continuity of purpose." 13 V.S.A. §§ 1021(4), 1061(1). The course of conduct could not rest on constitutionally protected activity. Id. § 1021(4). And the crime carried a three-year statute of limitations. Id. § 4501(e).

¶ 33. We agree with the trial court that the chargeable course of conduct could include acts outside the limitations period, as long as at least one act that meets the elements of the criminal stalking statute occurred within three years prior to the date defendant was charged in June 2015. See Rodriguez-Cayro v. State, 828 So. 2d 1060, 1061 (Fla. Dist. Ct. App. 2002) (rejecting argument that court could not consider stalking incidents that occurred outside statute of limitations "[b]ecause the legislature has clearly defined stalking as a continuing course of conduct crime" and "the statute began to run when [defendant] stopped the conduct" (quotation omitted)). The only act by defendant within the limitations period that could possibly meet the requirements of the statute was his book dissemination in 2015 on the campus where complainant worked.[9] The

_____

[9] The only evidence of any other potentially relevant action by defendant during the three-year limitations period is that in 2014 he said critical things about complainant to her student while

jury could only convict if this 2015 act was a constitutionally unprotected true threat, and would cause a reasonable person to fear unlawful sexual conduct, unlawful restraint, bodily injury, or death so as to satisfy the statutory definition of "harassing."  13 V.S.A. § 1061(3).  If it was not, then the State did not have sufficient evidence to convict under the statute, and any conviction reliant upon the 2015 communication would violate defendant's First Amendment rights.  If it was, then the State's evidence was sufficient, and a conviction based on the 2015 communication would not violate defendant's constitutional rights.[10]

¶ 34.    Considering the standard of review, case law describing the character of true threats, and the specific circumstances of this case, we conclude that a properly instructed jury could find that the statements in the book that defendant disseminated near complainant's workplace in 2015 were constitutionally unprotected, and that his actions "would cause a reasonable person to fear unlawful sexual conduct, unlawful restraint, bodily injury, or death."  Id. (defining "harassing").

¶ 35.    The question before us is not whether, as a matter of law, defendant's 2015 book communicated a constitutionally unprotected true threat, and it is not how the Court construes the evidence.  Rather, the question before us is whether a properly instructed reasonable jury could conclude that defendant's communication amounted to a "true threat."  See United States v. Stevens, 881 F.3d 1249, 1252 (10th Cir. 2018) ("Whether a reasonable jury could find [defendant's] statements to be true threats is a question of law. . . .  But, absent an unusual set of facts, the question whether statements amount to true threats is a question generally best left to a jury." (quotation omitted)), petition for cert. filed, __ U.S.L.W. __ (U.S. Sept. 10, 2018)

---

he was giving a cab ride to the student.  There is no evidence that he said anything in that setting that would reasonably cause complainant to fear unlawful sexual conduct, unlawful restraint, bodily injury, or death, or that the statements amounted to true threats.

[10]  On appeal, defendant does not argue that his conduct at complainant's college in 2008 and his following her in a remote parking lot with furrowed brow cannot qualify as "following" or "harassing" as those terms were defined in the statute.  But those acts alone, without any actionable conduct by defendant within three years of the State's charge, cannot support a stalking conviction.

16

(No. 5921); Turner, 720 F.3d at 419 (noting that most cases involving threats are within broad expanse of varying fact patterns which may not be resolved as matter of law); Fogel v. Collins, 531 F.3d 824, 829 (9th Cir. 2008) ("Deciding whether political speech is protected political hyperbole or an unprotected true threat can be an issue for a jury, particularly in cases of criminal prosecution.").

¶ 36. As noted above, the U.S. Supreme Court has defined true threats as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359. The prohibition of true threats "protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." Id. at 360 (quotations omitted). The speaker need not intend to deliver on the threat. Id. at 359-60. The Court, however, has been careful to warn that "a threat must be distinguished from . . . constitutionally protected speech," such as "political hyperbole," to ensure that "debate on public issues" is "uninhibited, robust, and wide open," which "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." Watts v. United States, 394 U.S. 705, 708 (1969).

¶ 37. We evaluate whether speech rises to the level of a true threat objectively—that is, "whether an ordinary, reasonable" person "familiar with the context of the communication would interpret it as a threat of injury." Turner, 720 F.3d at 420; see also Stevens, 881 F.3d at 1253; Bagdasarian, 652 F.3d at 1118; United States v. Armel, 585 F.3d 182, 185 (4th Cir. 2009); People v. Stanley, 170 P.3d 782, 787 (Colo. App. 2007); Brewington v. State, 7 N.E.3d 946, 964 (Ind. 2014); State v. Trey M., 383 P.3d 474, 485 (Wash. 2016).

¶ 38. The context of the speech is integral to this objective inquiry—both for statutory and constitutional purposes. Speech may or may not be objectively threatening depending on the circumstances of the parties involved. See Parr, 545 F.3d at 498 ("To assess whether [defendant's] statements were true threats, the jury needed to make inferences from background and context

17

about his demeaner at the time he made the statements—to decide, under the circumstances, whether he conveyed the impression that he was serious or joking."); Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 290 F.3d 1058, 1078 (9th Cir. 2002) ("We, and so far as we can tell, other circuits as well, consider the whole factual context and all of the circumstances in order to determine whether a statement is a true threat." (quotation omitted)); United States v. Hart, 212 F.3d 1067, 1072 (8th Cir. 2000) (concluding that defendant parking Ryder trucks in driveways of reproductive health clinic could be construed as threat to intimidate in context of, among other factors, ongoing protests and violence against such clinics and similarity of defendant's actions to well-known events of Oklahoma City bombing); State v. Krijger, 97 A.3d 946, 957 (Conn. 2014) ("Alleged threats should be considered in light of their entire factual context . . . . " (quotation and alteration omitted)). We will not engage in a "rigid adherence to the literal meaning of the communication without regard to its reasonable connotations." Stevens, 881 F.3d at 1253; State v. Bilder, 651 N.E.2d 502, 505 (Ohio Ct. App. 1994) ("Other acts evidence can be particularly useful in prosecutions for menacing by stalking because it can assist the jury in understanding that a defendant's otherwise innocent appearing acts, when put into the context of previous contacts [the defendant] has had with the victim, may be knowing attempts to cause mental distress."). We have likewise recognized that, under our criminal stalking statute, whether conduct amounts to stalking may depend on the context. See Hinchliffe, 2009 VT 111, ¶ 27 ("Without context, some behaviors do not seem inherently threatening.").

¶ 39. And the threatening speech need not be explicit or convey imminence. See United States v. Dillard, 795 F.3d 1191, 1200 (10th Cir. 2015) ("A threat of violence does not need to be imminent so long as it conveys a gravity of purpose and likelihood of execution." (quotation and alteration omitted)); Turner, 720 F.3d at 424 (stating that speech does not have to be "unequivocal, unconditional, immediate, and specific" to qualify as true threat); Parr, 545 F.3d at 497 ("It is true that [defendant] gave no precise time for carrying out his plan and did not relay his threats directly to his intended complainant. But neither point is dispositive."); People v. Lowery, 257 P.3d 72,

18

78 (Cal. 2011) (rejecting requirement for "proof that the speaker intended to inflict the threatening harm immediately, or had the apparent ability to do so"); DeLoreto, 827 A.2d at 682 ("Imminence . . . is not a requirement under true threats doctrine."); Harrell v. State, 778 S.E.2d 196, 200 (Ga. 2015) ("A 'true threat' may be conditional, need not be explicit, and the threatened violence need not be imminent."); A.T. v. C.R., 39 N.E.3d 744, 748-49 (Mass. App. Ct. 2015) (explaining that "[a] true threat does not require an explicit statement of an intention to harm the complainant" nor threat of imminent harm (quotation omitted)). Imminence, however, may be an important factor for the trier of fact in objectively determining whether the speech is a threat. See Dillard, 795 F.3d at 1200 ("Imminence may contribute to a finding that the communication constitutes a true threat, but it is not a required element."). Likewise, the criminal stalking statute does not require that the threat be explicit. Hinchliffe, 2009 VT 111, ¶ 21.

¶ 40. Given these considerations, we conclude that a trier of fact could find that, in the context of defendant's overall course of conduct as well as the specific context of the book he disseminated, the statement in the book "Shoot the terrorist? Or shoot the 'artist?' Neither are present" would cause a reasonable person to fear unlawful violence. Several considerations inform our opinion.

¶ 41. First, although defendant cites the length of time between incidents as evidence that the 2015 statement was not a true threat, a jury could reasonably conclude that the prolonged character of defendant's course of conduct rendered his statement about "shoot[ing] the artist" more, not less, threatening. That defendant continued to harbor such intense feelings for complainant that he published a book chapter about their relationship and distribute it within her work community could suggest that, even after a number of years, he was obsessed with complainant. The jury could reasonably conclude that such obsessive behavior would give rise to a heightened fear of unlawful restraint or bodily injury on the part of a reasonable person in complainant's circumstances. See State v. Ellis, 2009 VT 74, ¶ 26, 186 Vt. 232, 979 A.2d 1023 ("We do not dispute that obsessive behavior, without threats or attempted acts of violence, can

19

cause a person to fear unlawful restraint."); see also <u>Huch v. Marrs</u>, 858 So. 2d 1202, 1203 (Fla. Dist. Ct. App. 2003) (citing scholarly conclusion that stalking and obsessive or possessive behaviors indicate high risk to complainants); <u>State v. Lindell</u>, 828 N.W.2d 1, 8 (Iowa 2013) (citing authority for proposition that "stalking behavior often escalates into violence as time passes and the stalker's obsession with the victim grows").

¶ 42.    Second, and related, defendant's book cites defendant's knowledge of complainant's personal life, including that defendant had a copy of complainant's wedding video. Not only does this statement demonstrate that defendant had continued to keep close tabs on complainant in an obsessive manner, but a jury could conclude that defendant made a point of describing personal information about complainant's life following their 2007 break-up so that complainant would feel as though defendant was watching her.

¶ 43.    Third, the book accuses complainant of various perceived offenses, such as committing perjury, vandalizing defendant's car, purposely rubbing her new marriage in his face by driving past him with her husband, blocking his employment opportunities, refusing to get HIV testing while they dated, and deliberately applying "stress" on defendant to discover his "breaking point." As a result of these perceived offenses, the book explains that defendant felt traumatized. These grievances and statements by themselves would not be actionable as part of a course of conduct supporting a stalking charge, but they could inform the jury's understanding of the meaning of the "shoot the artist" reference.

¶ 44.    Fourth, this was not the first time defendant invoked the prospect of shooting or "killing" in the context of his public, rhetorical attacks on complainant. In 2011, his comments on her blog expressly addressed her art, and, in particular, his belief that she had produced a pro-military piece. But he exclaimed, "Go kill 'em [complainant]! Maybe we'll see more killing!" The jury could conclude that the 2015 "shoot the artist" statement was more threatening given the context of defendant's prior cryptic suggestion that "more killing" may happen.

20

¶ 45. Finally, defendant's other prior conduct—including, but not limited to, the acts that are part of the statutorily required "course of conduct"—could support a jury's conclusion that his 2015 statements were threats. His following and staring at complainant in an empty parking lot, his driving behind her at night while calling her from an anonymous number, and his coming to her workplace and making a scene after she had asked him to cease contact all inform a reasonable jury's consideration of the 2015 statements.

¶ 46. Alternatively, the jury could conclude that defendant's book included rude hyperbole critiquing complainant's art, and even complainant herself, but was nevertheless protected speech that did not convey a "true threat." Watts, 394 U.S. at 708. The jury may not draw any of the inferences identified above.

¶ 47. Given that the evidence in this case could support either conclusion, whether the 2015 statement amounted to a true threat under the constitution and harassment under 13 V.S.A. § 1061(3) is a question for the jury.

### III. Jury Instruction

¶ 48. Although we hold that § 1062 as it was written in 2015 was facially constitutional, and the State can, consistent with the First Amendment and the requirements of the criminal stalking statute, charge defendant with stalking on this evidence, we agree with defendant that the jury instruction allowed the jury to convict based on time-barred acts. In spite of defendant's objection, the instruction explained that the jury could convict if it determined that defendant engaged in a course of conduct requiring at least two acts that met the elements of the statute. It did not instruct that at least one of the two acts that constituted part of the course of conduct needed to occur within the applicable limitations period. This allowed the jury to convict based entirely on two acts that occurred outside the limitations period—such as the 2008 incident at the college

21

and the 2010 incident in the parking lot.[11]  For that reason, we reverse defendant's conviction and remand.

    <u>Affirmed in part, reversed in part, and remanded</u>.


FOR THE COURT:


_____

Associate Justice

---

[11]  Defendant also argues that the jury instruction was erroneous because the trial court refused to specifically tie the instruction to the constitutional true-threats test and muddled the intent element instruction by telling the jurors that "an expressed or actual threat need not have been made, so long as the act or acts would cause the stated effect on a reasonable person."  The court was apparently trying to instruct the jury that the threat need not be explicit if a reasonable person familiar with the context of the communication would interpret it as a threat of injury.  As noted above, this is an accurate statement of the law.  But we agree with defendant that this language could have been somewhat confusing for the jury.  On remand, the court should instruct the jury consistent with the law expressed in this opinion.